PRO–CHOICE NETWORK OF WESTERN NEW YORK, Buffalo Gyn Womenservices, P.C., Erie Medical Center, Paul J. Davis, M.D., P.C., Shalom Press, M.D., Barnett Slepian, M.D., Morris Wortman, M.D., Highland Obstetrical Group, Alexander Women's Group, Plaintiffs,

*v.*

PROJECT RESCUE WESTERN NEW YORK, Operation Rescue, Project Life of Rochester, Rev. Paul Schenck, Rev. James L. Evans, Rev. Ted Cadwallader, Dwight Saunders, David Anderson, Jeffrey Baran, Brian Bayley, Bonnie Behn, Ronald Breymeier, Gilbert Certo, Scott Chadsey, Kim Day, Constance Debo, Mark Dent, Wayne Dent, Paul Diemert, Joan Giangreco, Delores Glaser, Carmelina Golba, Kevin Golba, Linda Hall, Nancy Hall, Thomas Hall, Rev. Daniel Hamlin, James Handyside, Pamela Huffnagle, Donna Johanns, Eric Johns, Neal Kochis, Paulette Likoudis, Charles McGuire, Christopher Morrow, Annemarie Nice, Nicholas Pukalo, Carla Rainero, Thomas Riley, Patricia Ostrander, Linda Ross, David Smith, Linda Smith, Mark Sterlace, Joyce Strigel, John Thomann, John Tomasello, Paul Waldmiller, Jr., Nancy Walker, Leonard Winter, Horace Wolcott, Gerald Crawford, David Long, John Doe(s) and Jane Doe(s), the Last Two Being Fictitious Names, the Real Names of Said Defendants Being Presently Unknown to Plaintiffs, Said Fictitious Names Being Intended to Designate Organizations or Persons Who

Are Members of Defendant Organizations, and Others Acting in Concert With Any of the Defendants Who Are Engaging in, or Intend to Engage in, the Conduct Complained of Herein, Defendants.

No. Civ. 90–1004A.

United States District Court,
W.D. New York.

Feb. 14, 1992.

Isabelle Marcus, Lucinda Finley, Glenn Murray, Buffalo, N.Y., for plaintiffs.

James Duane, Virginia Beach, Va., for defendants.

## DECISION AND ORDER

ARCARA, District Judge.

### I.

### INTRODUCTION

Presently before the Court is plaintiffs' motion for a preliminary injunction, pursuant to Fed.R.Civ.P. 65(a), enjoining defendants from engaging in an allegedly illegal effort to prevent women from obtaining abortions and other gynecological and family planning services in a number of medical and family planning clinics located throughout the Western New York area. An evidentiary hearing was held over the course of several days from March 6, 1991 to April 1, 1991. The parties were then given an opportunity to brief and argue their respective positions. The Court has also considered evidence adduced at the contempt hearings of defendants Nancy Walker, Bonnie Behn, Carla Rainero, Rev. Paul Schenck, Rev. Robert Schenck and Project Rescue Western New York ("Project Rescue"). Each of these defendants was charged with violating the Court's temporary restraining order ("TRO") in this case.

As part of their response to the motion for a preliminary injunction, defendants have moved the Court to reconsider its Decision and Order dated October 29, 1990, denying defendants' motion to dismiss the action pursuant to the abstention doctrine.

After considering the evidence adduced at the preliminary injunction and contempt hearings, reviewing the submissions of the parties, and hearing argument from counsel, the Court grants plaintiffs' motion for a preliminary injunction. The preliminary injunction is attached as an Appendix to this Decision and shall also be filed under separate cover. Further, the Court has reconsidered its Decision and Order dated October 29, 1990, and denies defendants' motion to dismiss the action based on the abstention doctrine. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### II.

### BACKGROUND

Plaintiffs, Buffalo GYN Womenservices, Erie Medical Center, Paul Davis M.D., Shalom Press M.D., Barnett Slepian M.D., Highland Obstetrical Group and Alexander Women's Group, are health care providers located in the Western New York area. They offer family planning services, abortion services and gynecological services at their health care facilities. Plaintiff Pro–Choice Network of Western New York is a not-for-profit corporation based in Buffalo, New York. Its primary goal is to maintain legal and safe access to family planning and abortion services in the Western New York area. It also organizes some of its

members to serve as escorts for patients seeking access to plaintiff health care providers' facilities.

Defendants include three organizations, Project Rescue Western New York, Operation Rescue and Project Life of Rochester, and fifty individuals opposed to abortion and dedicated to the "pro-life" movement.[1] Plaintiffs allege that defendants have been engaged in a consistent pattern of illegal conduct at plaintiffs' health care facilities including blockading access to and egress from their facilities, trespassing, and harassment and intimidation of patients and staff.

On September 24, 1990, plaintiffs commenced this action by filing a Complaint asserting seven causes of action. The first cause of action asserts claims under 42 U.S.C. § 1985(3), based on an alleged conspiracy to deny women seeking abortion or family planning services the equal protection of the laws and the equal privileges and immunities of national citizenship. More specifically, plaintiffs allege that defendants have conspired to infringe the constitutional rights of women seeking abortion and family planning services to travel and to choose to have an abortion.[2] The Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1343. The remaining six causes of action assert claims based on New York State law. They include: (1) violation of N.Y.Civ.Rights Law § 40–c, and N.Y.Exec.Law § 296; (2) tortious interference with business; (3) trespass; (4) intentional infliction of emotional harm; (5) tortious harassment; and (6) false imprisonment.[3] These causes of action fall under the Court's supplemental jurisdiction. Along with declaratory and injunctive relief, plaintiffs seek compensatory and punitive damages.

Immediately upon filing their Complaint on September 24, 1990, plaintiffs moved for a TRO, pursuant to Rule 65(b), to enjoin a "blockade" that defendants had announced for September 28, 1990. The location of the "blockade" was to be kept secret until the morning it was scheduled to occur. On September 26, 1990, the Court conducted a hearing and heard oral argument on the application for a TRO. On September 27, 1990, after hearing further argument from plaintiffs' counsel and some of the named defendants, and after reviewing the Complaint and supporting affidavits, the Court, following *New York State NOW v. Terry*, 704 F.Supp. 1247 (S.D.N.Y.), *aff'd*, 886 F.2d 1339 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990), issued a TRO enjoining defendants from conducting any "blockade" of plaintiffs' medical facilities, and from harassing patients and staff entering or exiting the facilities.

Defendants complied with the TRO by holding a peaceful demonstration, rather than a "blockade," on September 28, 1990. The Court then scheduled a hearing for October 4, 1990, in order to determine whether the TRO should be converted into a preliminary injunction pursuant to Rule 65. At the October 4, 1990 hearing, plaintiffs established service on nearly all defendants, and James Duane, Esq. appeared on defendants' behalf. Mr. Duane alerted the Court that it was defendants' intention to file a motion to either dismiss or stay the action pursuant to the abstention doctrine. The Court then put the parties on a briefing schedule and issued an order extending the TRO until the motion was decided.

---

1. The Complaint also names as defendants John and Jane Doe. These are obviously fictitious names and are intended to represent members of defendant organizations and others acting in concert with the named defendants.

2. The Court notes that a case involving similar issues is pending before the United States Supreme Court. *NOW v. Operation Rescue*, 726 F.Supp. 1483 (E.D.Va.1989), *aff'd*, 914 F.2d 582 (4th Cir.1990), *cert. granted, sub nom., Bray v. Alexandria Women's Health Center*, — U.S. ——, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991).

While the outcome in that case may require the Court to revisit this Decision, the Court has an obligation to move forward with the law as it currently stands in this Circuit.

3. Plaintiffs filed an Amended Complaint on October 17, 1990 and a Second Amended Complaint on November 5, 1990. Neither of these complaints changed the substantive claims against defendants. They simply added certain plaintiffs to the action.

Oral argument on defendants' motion to dismiss or stay the action was held on October 19, 1990. In a Decision and Order dated October 29, 1990, the Court denied defendants' motion. In an Order dated November 2, 1990, the Court, with defendants' consent, ordered that the TRO would remain in effect until the motion for a preliminary injunction was decided.

On October 22, 1990, during the pendency of defendants' motion to dismiss, plaintiffs filed motions for civil contempt against defendants Bonnie Behn and Carla Rainero alleging that they violated the Court's TRO on October 20, 1990. On December 6, 1990, plaintiffs filed a motion for civil contempt against defendant Nancy Walker alleging that she violated the TRO on November 29 and December 1, 1990. On December 14, 1990, plaintiffs filed another motion for civil contempt against Walker alleging that she violated the TRO on December 8, 1990. On March 26, 1991, plaintiffs filed motions for civil contempt against defendants Rev. Paul Schenck, Rev. Robert Schenck and Project Rescue alleging that they violated the TRO on December 29, 1990.[4]

During the months of December, 1990 and January, 1991, the parties, with the assistance of the Court, attempted unsuccessfully to settle this action. A hearing on the contempt motion against Nancy Walker was then held from February 6, 1991 to February 14, 1991. Then, as stated earlier, a preliminary injunction hearing was held from March 6, 1991 to April 1, 1991. Subsequently, a hearing on the contempt motions against Bonnie Behn and Carla Rainero was held from June 18, 1991 to July 12, 1991. Finally, a hearing on the contempt motions against Rev. Paul Schenck, Rev. Robert Schenck and Project Rescue was held from October 15, 1991 to January 30, 1992.

## III.

### FINDINGS OF FACT

It is indisputable that all defendants in this case share a deep commitment to the goals of stopping the practice of abortion and reversing its legalization. To achieve these goals, individual defendants have agreed and combined with one another and with the organizational defendants to coordinate, organize and participate in "rescue" demonstrations at abortion clinics located throughout Western New York. While these "rescue" demonstrations are usually peaceful in nature, they often become emotionally charged encounters between demonstrators, patients and patient escorts.

During the hearings, several defendants insisted that Project Rescue is not an entity subject to being enjoined or held in contempt. The Court finds that, although not organized in corporate or partnership form, Project Rescue produces and distributes literature that encourages participants to gather in front of abortion clinics and block or impede access to them, has official spokespersons and designated leaders who organize and plan its activities, possesses a mailing address, engages in correspondence, has an active telephone "hotline", seeks donations in its name, and reimburses its members for expenses. Thus, Project Rescue possesses adequate characteristics of a legal entity to be enjoined or held in contempt.

There are three types of "rescue" demonstrations at issue in this case: (1) physically "blockading" health care facilities in order to prevent women seeking abortions and medical personnel from entering or exiting the facilities; (2) constructively "blockading" the clinics by demonstrating and picketing in a loud and disruptive manner outside the health care facilities, and by harassing patients and staff trying to enter such facilities; and (3) "sidewalk counseling" of patients entering the clinic. By disrupting and "blockading" family planning and abortion clinics, and conducting "sidewalk counseling," defendants and their followers hope to: (1) prevent abortions; (2) dissuade women from seeking

---

4. On January 3, 1992, plaintiffs filed a motion for civil contempt against defendants Rev. Paul Schenck and Rev. Daren Drzymala. The Court has not yet held a hearing on this contempt motion.

abortion services; and (3) impress upon the public the moral righteousness of their "pro-life" views.

## A.

### Blockading

The first type of "rescue" demonstration involves physically "blockading" access to and egress from the plaintiffs' clinics. This type of "rescue" demonstration is usually well organized and involves a large number of "pro-life" demonstrators. During these "blockades," the demonstrators trespass on the clinic property and sit or lay in the entrances of the clinic in an attempt to block access to and egress from the clinic. The demonstrators often lock arms or chain themselves together in order to make it more difficult for police to remove them. The plaintiff health care providers have been victims of these "blockades" on numerous occasions. On many of those occasions, the operation of the targeted facility was effectively stopped or significantly hampered. This physical "blockade" type of "rescue" demonstration was the type scheduled by defendants for September 28, 1990, and was the impetus behind the Court's TRO.[5]

## B.

### Constructive Blockade

Besides physically "blockading" the clinics, defendants also constructively "blockade" them by demonstrating and picketing around the entrances of the clinics, and by harassing patients and staff entering and leaving the clinics. The constructive "blockade" has the same purpose as the physical "blockade," i.e., to prevent or dissuade patients from entering the clinic. However, instead of physically blocking patient access to the clinics, defendants constructively "blockade" the clinics by forcing patients to run a gauntlet of harass-

ment and intimidation in the hope that the patients will turn away before entering.

On days when abortions are scheduled to be performed, defendants and others acting in concert with them under the auspices of the organizational defendants, picket and demonstrate in and around plaintiffs' health care facilities. Demonstrators frequently and routinely congregate in or near the driveway entrances to the facility parking lots in order to impede and obstruct access to the facilities. The presence of numerous demonstrators in the driveway entrances intimidates and impedes the drivers of cars seeking access to the parking lots of the facilities and creates a danger to both the occupants of the cars and the demonstrators themselves. The demonstrators also make loud and disruptive noises and chant persistently. On some occasions, the drivers and occupants of the cars trying to enter the clinic parking lots are so intimidated or confused by the demonstrators that they leave the area thereby causing those occupants seeking health care to suffer a delay in obtaining such care.

At times, demonstrators yell at patients, patient escorts and medical staff entering and leaving the health care facilities. The demonstrators also crowd around people trying to enter the facilities in an intimidating and obstructing manner, and grab, push and shove the patients, patient escorts and staff. This activity causes stress and sometimes even physical injury to the patients, patient escorts and medical staff, and disrupts the atmosphere necessary for rendering safe and efficacious health care.

## C.

### "Sidewalk Counseling"

Defendants also engage in an activity that they refer to as "sidewalk counseling." "Sidewalk counseling" consists of proffering literature to women entering the health care facilities and trying to convince them not to undergo an abortion. While

---

5. Prior to the preliminary injunction hearing, defendants stipulated that the physical "blockade" type of "rescue" demonstration may be enjoined. Thus, the evidence adduced at the preliminary injunction hearing centered on the constructive "blockade" type of demonstration and "sidewalk counseling." Commendably, there have been no physical "blockades" since the Court issued the TRO.

defendants contend that this "sidewalk counseling" is done in a peaceful, non-threatening manner and is only intended to provide women with the information necessary to make an informed decision about abortion, the evidence adduced at the hearings clearly demonstrates that, because of the highly emotional nature of the abortion issue, and the privacy concerns of the patients, even peaceful counseling, when conducted in the compressed space at the entrances of the medical facilities, often erupts into a charged encounter between "sidewalk counselors," patients and patient escorts.

During these encounters, "sidewalk counselors" often become angry and frustrated when patients and patient escorts persist in entering the clinics.[6] The "counselors" then turn to harassing, badgering, intimidating and yelling at the patients and patient escorts in order to dissuade them from entering. They continue to do so even after the patients signal their desire to be left alone. The "sidewalk counselors" often crowd around patients, invade their personal space and raise their voices to a loud and disturbing level. At times, the voices of "sidewalk counselors" can be heard inside the health care facilities, thereby disturbing the quiet environment necessary for providing safe and efficacious health care. Some "counselors" have even used bullhorns to reach patients who have already entered the clinics.

The "sidewalk counselors" are comprised of a small group of dedicated "pro-life" activists who station themselves in front of plaintiffs' medical facilities on a regular basis. Many of the "sidewalk counselors" and other defendants have been arrested on more than one occasion for harassment, yet persist in harassing and intimidating patients, patient escorts and medical staff. Defendant Project Rescue offers training

in the technique of "sidewalk counseling" and organizes the activities of "sidewalk counselors" by designating times and locations for "counseling," designating site captains for such "counseling," and directing "counselors" to keep a log of their activities and send information about their "counseling" to a designated member of the organization. Project Rescue has also reimbursed "sidewalk counselors" for their expenses.

Besides abortions, plaintiff health care facilities provide women with a variety of other medical and family planning services. Because information about patients is kept strictly confidential, the "sidewalk counselors" do not know which patients entering the facilities are there for an abortion and which are there to obtain some other medical or family planning service. The "sidewalk counselors" target younger-looking women because they are the ones most likely to be seeking an abortion. They also target cars that arrive at the facilities with out-of-state license plates because many of the patients coming to area clinics are from nearby states, especially Pennsylvania and Ohio, and from Canada. There is no way, however, for the "sidewalk counselors" to know for sure whether a woman entering the clinic is even seeking an abortion.

During "rescue" activities, defendants regularly use video cameras. Defendants insist that the purpose of the cameras is to record the actions of the "sidewalk counselors" so that the videotapes can be used to defend the "counselors" against unfounded harassment charges. However, the evidence adduced at the hearings clearly indicates that, instead of using cameras for defensive purposes, defendants employ them as offensive weapons to intimidate patients seeking abortions.[7]

The videotapes offered by defendants during the contempt hearings show that

---

**6.** The Court notes that the patient escorts also become frustrated and angry by the persistence of the "sidewalk counselors." The patient escorts often respond by raising their voices in order to drown out the "counselors'" message, and attempt to block and impede the "sidewalk counselors" from following the patients. While the Court can understand the frustration of the escorts, the evidence adduced at the hearings

clearly shows that their behavior often serves only to exacerbate an already difficult situation.

**7.** The Court heard testimony from two of the individuals who normally operate the video cameras, Michael Prestia and Richard Krolewicz. They stated that the only reason for the cameras being present is to protect the "sidewalk counselors" from unfounded harassment charges. *The Court, however, finds that the*

the operators of the video cameras selectively record only those events that are favorable to defendants. During crucial moments when contemptuous conduct is alleged to have occurred, the camera was either turned off or pointed at the ground. Moreover, while defendants' stated purpose in using the video cameras is to record the activities of the "sidewalk counselors," the videotapes presented at the hearings show that the camerapersons almost always focus on the patient and the patient escorts. The "sidewalk counselors" are often not even on the screen. Thus, defendants' assertion that the cameras are used solely for defensive purposes is just not credible.[8]

Instead, the evidence clearly shows that defendants use cameras as offensive weapons to harass and intimidate patients entering the clinics. Defendants have even pointed the cameras directly into the faces of patients seeking access to the clinics. They have also videotaped patient vehicles and their license plates as they enter the medical facilities. Defendants are well aware that women seeking abortions, especially younger women, are often terrified at the prospect of anyone, especially family members, finding out that they are having an abortion, and that the presence of cameras increases patients' fear that their identities might be revealed.

Thus, in view of all the evidence, it is reasonable to infer that defendants use cameras not as a defensive measure against unfounded harassment charges, but as offensive weapons to intimidate and embarrass patients into foregoing their scheduled appointments.

## D.

### Response of Local Law Enforcement

Local law enforcement has been unable to respond effectively to plaintiffs' complaints about "pro-life" demonstrators harassing patients and blocking access to the clinics. Defendants participate in their "rescue" activities on a continual basis and the local police do not have the resources necessary to monitor the situation constantly. Often times when they respond to a complaint, the demonstrators simply disperse, only to return later when the police depart. Even when police arrest a "pro-life" demonstrator for harassing a patient, successful prosecution is often difficult because the patient is reluctant to testify or cooperate out of fear that her identity might be made public. Furthermore, the record shows that arrest and conviction pursuant to local laws has not deterred defendants from repeatedly engaging in their illegal pattern of activity.

The large scale "blockades" pose a particular problem for police. The time and location of "blockades" are kept secret from the police so that they will be delayed in responding. Local law enforcement's response to large scale "blockades" requires a substantial commitment of police resources. Testimony adduced at the hearings also indicates that defendants have attempted to strike "deals" with the police as to the conditions under which they will cease their illegal activity, *i.e.*, defendants agree to cease "blockading" only if the clinic is closed down for the rest of the day.

In addition, defendants have attempted to hinder and interfere with local law enforcement by harassing those who invoke legal process against them. Local deputy police chief Samuel Camilleri testified that he and his fellow officers have been the object of harassment—both verbally and by mail—by the demonstrators. Chief Camil-

---

testimony of these two individuals was biased, suspect and incredible. Their testimony was wrought with inconsistency, and their answers on cross-examination were often nonresponsive and evasive.

**8.** During the hearing on the contempt motion against Rev. Paul Schenck, Rev. Robert Schenck and Project Rescue, plaintiffs made allegations

that the videotapes offered into evidence by defendants were edited after the fact in order to eliminate footage damaging to defendants. Accordingly, as part of that hearing, the Court heard testimony from two expert witnesses as to the authenticity of the videotapes. The Court has not yet made a final determination whether the tapes were edited.

leri indicated that this harassment made it more difficult for him to do his job. Similar harassment has been directed against people who have testified against the demonstrators in local criminal court proceedings.

### E.

#### *The Health Risks to Women Caused by Defendants' Activities*

Women who have been the target of "sidewalk counseling" or other "rescue" demonstrations usually enter the medical facilities visibly shaken and severely distressed. Several of the plaintiff health care providers testified that, for most women, the decision to undergo an abortion is already difficult and stressful. Plaintiffs presented uncontradicted testimony that the risks associated with an abortion increase if the patient suffers from additional stress and anxiety. Increased stress and anxiety can cause patients to: (1) have elevated blood pressure; (2) hyperventilate; (3) require sedation; or (4) require special counseling and attention before they are able to obtain health care. Patients may become so agitated that they are unable to lie still in the operating room thereby increasing the risks associated with surgery.

Often times, patients are too upset to undergo the medical procedures scheduled for that day and must reschedule the procedure, though there is no guarantee that they will not encounter the demonstrators again upon returning. This delay can increase the risks associated with an abortion. For example, the delay may move the pregnancy from the first trimester to the second trimester during which the risks associated with the procedure increase. Other women who are seeking a post-abortion check-up might delay their appointment or simply cancel it altogether, thereby enhancing the possibility of complications. For some women who elect to undergo an abortion, clinic medical personnel prescribe and insert a device known as a pre-abortion laminaria to achieve cervical dilation. In these instances, timely removal of the laminaria is necessary to avoid infection, bleeding and other potentially serious complications. If a woman returning to have the laminaria removed finds that her access to the clinic entrance is blocked or impeded, or if she becomes so distressed by the "sidewalk counselors" that she cannot undergo surgery, the above-mentioned complications may result.

For some women, the option to reschedule their appointment is not readily available. As stated earlier, many of the women seeking abortions in this area come from out-of-state and cannot readily reschedule their appointments if they are prevented or deterred by defendants' conduct from obtaining the abortion on the scheduled day.

The presence of video cameras is especially distressing to patients seeking abortions. The use of video cameras by defendants often makes patients hysterical or severely upset, thereby causing a delay in their readiness for prompt medical attention. Furthermore, defendants' use of the video cameras prolongs the patients' stress and anxiety as they worry that their identity may be obtained by defendants and revealed to others, such as family members.

### IV.

### CONCLUSIONS OF LAW

#### A.

#### *Standing*

In *Terry*, the Second Circuit held that health care providers have independent standing to assert the rights of their patients to travel freely and to obtain abortion services. The court reasoned that a patient's "enjoyment of those rights is inextricably bound up with the activity the litigant wishes to pursue," and thus, the court could be "assured that the clinics represent the rights and interests of the women seeking their assistance." *Terry*, 886 F.2d at 1348 (citations omitted). The court also held that "pro-choice" organizations have standing as representatives of their membership. *Id.* at 1349.

**1428**

## B.

### *Preliminary Injunction*

It is well-established in the Second Circuit that a preliminary injunction may be granted only where the movant establishes (1) irreparable harm (if the injunction is not granted), and (2) either (a) the likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989); *Johnson v. Kay*, 860 F.2d 529, 540 (2d Cir.1988); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

### 1.

### *Irreparable Harm*

"[A] finding of irreparable harm is an absolute prerequisite to the issuance of an injunction...." *Fireman's Fund Ins. Co. v. Leslie & Elliot Co.*, 867 F.2d 150, 151 (2d Cir.1989).

> To establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent. The injury must be one requiring a remedy of more than mere money damages. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation.

*Tucker Anthony Realty Corp.*, 888 F.2d at 975 (citations omitted).

■ A deprivation of constitutional rights that cannot be repaired by an award of damages constitutes irreparable injury. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2d Cir.1985); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984). In this case, plaintiffs claim that defendants' "rescue" activities violate the constitutional rights of women to travel and to choose to have an abortion.

■ Furthermore, as stated in the Court's Findings of Fact, plaintiffs have presented compelling, uncontradicted evidence that defendants' "rescue" activities cause patients stress and anxiety, thereby substantially increasing the risks associated with the medical procedures performed at the clinics. In addition, patients are often: (1) blocked from entering the clinics; (2) intimidated and harassed by defendants thereby causing them to skip their scheduled appointments; or (3) too upset to undergo the medical treatment scheduled for that day. The resulting delay increases the risks associated with the abortion procedure and may lead to unnecessary complications.

In assessing irreparable injury and the need for injunctive relief, the Court is mindful of the fact that defendants intentionally target young women who are already undergoing the stressful situation of terminating an unwanted pregnancy. Thus, the Court must balance the need to protect these young vulnerable women from defendants' harassment against defendants' First Amendment rights.

The evidence also shows that defendants' activities have an adverse effect on the clinic medical staffs. Witnesses testified to increased stress among staff members that is directly attributable to defendants' "rescue" activities. This increase in stress causes the staff to be distracted and makes it difficult for them to maintain the calm environment necessary for treating patients.

In sum, the Court finds that those women denied unimpeded access to plaintiffs' health care facilities cannot be compensated merely by money damages. Injunctive relief alone can assure women unimpeded access to plaintiffs' clinics. The irreparable harm flowing from defendants' "rescue" activities, including the medical risks and the denial of constitutionally guaranteed rights, is real and threatens to continue. Without some form of injunctive relief, prospective patients will suffer irreparable harm from delayed access to the clinics. *Terry*, 886 F.2d at 1362.

## 2.

*Likelihood of Success on the Merits or Sufficiently Serious Questions Going to the Merits to Make Them a Fair Ground for Litigation and a Balance of Hardships Tipping Decidedly in Plaintiffs' Favor*

### a.

*The 42 U.S.C. § 1985(3) Claims* [9]

To prevail on a § 1985(3) claim, a plaintiff must prove that: (1) defendants engaged in a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) acted in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Terry*, 886 F.2d at 1358 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)). It is well established that § 1985(3) provides a cause of action for private conspiracies. *Id.* (citations omitted). Where the alleged conspiracy is aimed at the deprivation of a constitutional right guaranteed against government interference, for example, rights secured by the First and Fourteenth Amendments, plaintiffs must demonstrate "state involvement." *Id.* (citation omitted).

■ A conspiracy is within the scope of § 1985(3) only if it is motivated by some class-based, invidiously discriminatory animus. *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798. "Animus" means a motive or intent to interfere with the exercise of a right; not hostility, ill-will or personal animosity. *Id.* at 102 n. 10, 91 S.Ct. at 1798 n. 10;

*Terry*, 886 F.2d at 1359–60. While the Supreme Court has thus far declined to rule on whether § 1985(3) reaches conspiracies directed against a class identified by characteristics other than race, *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 836, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983) ("close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans."); *Griffin*, 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9, the Second Circuit in *Terry* expressly held that women seeking abortions constitute a protected class for purposes of § 1985(3). *Terry*, 886 F.2d at 1359.[10]

■ In this case, plaintiffs have proven, by a preponderance of the evidence, that defendants engaged in a conspiracy to prevent women from obtaining access to plaintiffs' health care facilities. Project Rescue literature encourages participants to gather in front of clinics and block or impede access to them. Defendants agreed between themselves and with others to engage in unlawful activity such as trespassing and harassment. The conspiracy has an official spokesperson and designated leaders. Project Rescue reimburses members for costs incurred in furtherance of the conspiracy. This concerted effort clearly demonstrates the presence of a conspiracy to engage in an unlawful activity.

It is clear under *Terry* that defendants have the requisite class-based animus. There is uncontroverted evidence that defendants are opposed to the constitutional right of a woman to choose to have an abortion and that the object of their "rescue" activities is to hinder or prevent wom-

---

9. Defendants argue that injunctive relief is not available under § 1985(3). However, several federal courts, including the Second Circuit, have held that injunctive relief is available under § 1985(3). *See, e.g., Planned Parenthood v. Holy Angels Catholic Church*, 765 F.Supp. 617 (N.D.Cal.1991); *Women's Health Care Services v. Operation Rescue–National*, 773 F.Supp. 258 (D.Kan.1991); *NOW v. Operation Rescue*, 726 F.Supp. 1483 (E.D.Va.1989), *aff'd*, 914 F.2d 582 (4th Cir.1990), *cert. granted, sub nom. Bray v. Alexandria Women's Health Center*, —— U.S. ——, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991); *Terry*, 704 F.Supp. at 1247; 886 F.2d at 1339;

*Cousins v. Terry*, 721 F.Supp. 426 (N.D.N.Y. 1989); *Southwestern Medical Clinics of Nevada v. Operation Rescue*, 744 F.Supp. 230 (D.Nev. 1989).

10. The issue of whether women seeking abortions can constitute a protected class under § 1985(3) is currently pending before the Supreme Court. *See NOW v. Operation Rescue*, 726 F.Supp. 1483 (E.D.Va.1989), *aff'd*, 914 F.2d 582 (4th Cir.1990), *cert. granted, sub nom., Bray v. Alexandria Women's Health Center*, —— U.S. ——, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991).

en—a group that is a protected class under § 1985(3)—from exercising that right.

In sum, it is apparent that defendants are acting within the scope of § 1985(3) by: (1) engaging in a conspiracy; (2) against a cognizable class of persons, with invidious class-based animus; and (3) committing overt acts in furtherance of the conspiracy. The only remaining question is whether the conspiracy deprived the plaintiffs, and the women on whose behalf this claim is asserted, of any constitutional right. Plaintiffs claim that defendants' conspiracy infringes two constitutional rights of women seeking abortions: (1) the right to interstate travel; and (2) the right to choose to have an abortion.

### (1)

### *Right to Travel*

■ "[T]he right to interstate travel is constitutionally protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private as well as governmental interference." *Griffin*, 403 U.S. at 105, 91 S.Ct. at 1800 (citations omitted). Deprivations of the right to travel are actionable under § 1985(3) with no need to show any state action or involvement. *Terry*, 886 F.2d at 1360 (citations omitted). The right to travel includes the right to unimpeded interstate travel to obtain an abortion and other medical services. *Doe v. Bolton*, 410 U.S. 179, 200, 93 S.Ct. 739, 751, 35 L.Ed.2d 201 (1973); *Terry*, 704 F.Supp. at 1259; 886 F.2d at 1360.

■ In this case, plaintiffs have presented uncontroverted evidence that defendants' "rescue" activities have infringed the right of women to travel interstate to obtain an abortion. Plaintiffs' health care facilities render services to patients from other states, especially Pennsylvania and Ohio, and Canada. As stated earlier, defendants specifically target these out-of-state patients because they are easily identifiable. When out-of-state patients arrive at the clinics, they encounter "pro-life" demonstrators obstructing the clinic driveways thereby impeding them from entering the clinic parking lots. These obstructions require patients to take circuitous routes in order to enter the clinics unmolested. Out-

of-state patients have been forced to cancel their scheduled appointments on days when there were "rescue" demonstrations. The burden of having to reschedule an appointment is obviously greater for a patient having to travel from another state or Canada than it is for a local patient. In sum, it is clear that infringing the right of women to travel interstate to obtain an abortion is one of the objectives of defendants' conspiracy.

■ Defendants argue that the right to travel is not implicated here because the primary objective of their "rescue" activities is to prevent women from having abortions, not to infringe the right of women to travel. However, interfering with the right to travel does not have to be the primary objective of defendants' conspiracy in order for § 1985(3) to apply. In *Griffin*, the defendants stopped and assaulted the plaintiffs who were driving on an interstate highway. The defendants had presumed that the plaintiffs, who were black, were involved in the civil rights movement, and wanted to stop the plaintiffs from further organizing civil rights activities. The Supreme Court held that, while the primary objective of the conspiracy was to interfere with the right of the plaintiffs to engage in organizing civil rights activities, the fact that the interference occurred while the plaintiffs were traveling on an interstate highway was sufficient to implicate the right to travel. *Id.* 403 U.S. at 106, 91 S.Ct. at 1800. Thus, in this case, because plaintiffs have demonstrated that one of the objectives of defendants' conspiracy is to infringe the right of women to travel, § 1985(3) applies.

In sum, the Court finds that the plaintiffs have established a likelihood of success on the merits on their § 1985(3) claim based on the right to travel.

### (2)

### *Right to Choose to Have an Abortion*

■ The Supreme Court has held that a woman has a constitutional right under the Fourteenth Amendment to choose to have an abortion during the first trimester of her pregnancy without governmental interference. *Roe v. Wade*, 410 U.S. 113, 163, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973).

Because the right to have an abortion derives from the Fourteenth Amendment, which prohibits only governmental interference, a conspiracy targeted at that right must implicate "state involvement" before it is actionable under § 1985(3). *Scott*, 463 U.S. at 833, 103 S.Ct. at 3358; *Terry*, 704 F.Supp. at 1260.

■ The "state involvement" requirement is not the same as a "state action" test. As the Supreme Court has explained, it is merely "necessary ... to prove that the State was somehow involved in or affected by the conspiracy." *Scott*, 463 U.S. at 833, 103 S.Ct. at 3358.

> [If] private persons take conspiratorial action that prevents or hinders the constituted authorities of any state from giving or securing equal treatment, the private persons would cause the authorities to violate the Fourteenth Amendment; the private persons would then have violated § 1985(3).

*Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 384, 99 S.Ct. 2345, 2355, 60 L.Ed.2d 957 (1979) (Stevens, J., concurring); *accord Scott*, 463 U.S. at 840 n. 2, 103 S.Ct. at 3362 n. 2.

■ In this case, there has been substantial uncontradicted evidence that defendants' activities are intended, and do in fact, prevent and hinder local police from protecting the right of women to choose to have an abortion. By "blockading" access to abortion clinics in large numbers, refusing to notify police of their next target, attempting to strike "deals" with the police, and harassing the police officers and witnesses who testify against them in local criminal courts, defendants have acted to render local law enforcement officials incapable of keeping the clinics readily accessible to women who choose to have an abortion. Such action by private persons satisfies § 1985(3)'s "state involvement" requirement. *See Women's Health Care Services*, 773 F.Supp. at 265–66; *Terry*, 704 F.Supp. at 1260; *Portland Feminist Women's Health Center v. Advocates for Life, Inc.*, 712 F.Supp. 165, 168 (D.Oregon), *aff'd as modified*, 859 F.2d 681 (9th Cir.1988); *but see Volunteer Medical Clinic, Inc. v. Operation Rescue*, 948 F.2d 218 (6th Cir.

1991); *Lucero v. Operation Rescue of Birmingham*, 772 F.Supp. 1193 (N.D.Ala. 1991); *Upper Hudson Planned–Parenthood, Inc. v. Doe*, 1991 WL 183863 (N.D.N.Y. Sept. 16, 1991).

■ Furthermore, it cannot be disputed that defendants' activities have the object of depriving women of their right to choose to have an abortion. In addition, the same facts that satisfy the overt act requirement in connection with plaintiffs' claim based on their right to travel, likewise meet the overt act requirement for this claim. Finally, defendants' actions threaten injury to the protected class of women seeking abortions.

In sum, the Court finds that the plaintiffs have demonstrated a likelihood of success on the merits of their § 1985(3) claim based on the right of women to choose to have an abortion.

### b.
### *State Law Claims*
### (1)
### *New York Civil Rights Law*

■ Having demonstrated a likelihood of success on the merits of their federal § 1985(3) claim, plaintiffs have also, by definition, demonstrated a likelihood of success on their claim under N.Y. Civ. Rights Law § 40–c. This section, which affords a private right of action against private individuals, provides that "no person shall, because of ... sex ... be subjected to any discrimination in his civil rights, or to any harassment, as defined in section 240.05 of the penal law, in exercise thereof, by any persons...." Since defendants' conspiracy is intended to deprive women of their constitutional rights to travel and to choose to have an abortion, and subjects them to harassment when they seek to exercise those rights, the conspiracy clearly violates N.Y. Civ. Rights Law § 40–c. Thus, plaintiffs have demonstrated a likelihood of success on the merits of this claim.

### (2)
### *Trespass*

■ Under New York law, trespass is the interference with a person's right to possession of real property either by an

unlawful act or by a lawful act performed in an unlawful manner. *Ivancic v. Olmstead*, 66 N.Y.2d 349, 352, 497 N.Y.S.2d 326, 488 N.E.2d 72 (1985), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 658 (1986). To be liable, the trespasser need not anticipate the damaging consequences of his acts, but need only intend the act that amounts to an unlawful intrusion upon and interference with the property rights of another. *Phillips v. Sun Oil Co.*, 307 N.Y. 328, 331, 121 N.E.2d 249 (1954). The threat of continuing trespass entitles a property owner to injunctive relief where irreparable injury may result. *Terry*, 886 F.2d at 1361 (citing *Exchange Bakery & Restaurant, Inc. v. Rifkin*, 245 N.Y. 260, 268, 157 N.E. 130 (1927)).

■ In this case, there is overwhelming evidence that defendants have repeatedly trespassed upon plaintiffs' property in the past and may continue to trespass in the future. A "blockade" is an intentional, unlawful act that clearly interferes with plaintiffs' right to possession of the facilities. Accordingly, plaintiffs have demonstrated a likelihood of success on the merits of their state trespass claim.[11]

## C.

### *Restriction on Defendants' First Amendment Rights*

■ There is no question that defendants' activities constitute a form of political speech protected by the First Amendment. Defendants are entitled to express their views on abortion, "particularly when standing on a public sidewalk where, since time immemorial, the authority to regulate speech is sharply restricted." *Terry*, 886 F.2d at 1363 (citing *United States v. Grace*, 461 U.S. 171, 177–80, 103 S.Ct. 1702, 1706–09, 75 L.Ed.2d 736 (1983)). Yet, the First Amendment does not provide defendants with the "right to express their views to any person, at any time, in any manner, and in any place they may choose." *Id.* (citing *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)). Reasonable time, place and manner restrictions

may be placed on defendants' activities as long as such restrictions are: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information. *Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (citations omitted); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). "The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.... The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (citations omitted).

After applying these principles to this case, the Court finds that the preliminary injunction is: (1) content neutral; (2) narrowly tailored to serve a number of significant government interests; and (3) leaves open ample alternative channels for communication of defendants' message. Thus, the injunction is a reasonable time, place and manner restriction and is not violative of defendants' First Amendment rights.

### 1.

### *Content Neutral*

■ Content-neutral regulations of expression are "those that 'are justified without reference to the content of the regulated speech.'" *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). "The primary concern of content-neutrality is that no speech or expression of a 'particular content' is 'singled out' by the government for better or worse treatment." *Terry*, 886 F.2d at 1363 (citations omitted).

---

**11.** In light of the Court's decision with regard to plaintiffs' § 1985(3) claim, N.Y. Civ.Rights Law § 40–c claim and state trespass claim, the Court need not address whether a preliminary injunction should be granted based on plaintiffs' other state law claims.

■ In this case, the preliminary injunction is content-neutral. It regulates when, where and how defendants may speak, but not what they may say. The injunction makes no mention whatsoever of abortion or any other substantive issue; it merely restricts the volume, location, timing and harassing and intimidating nature of defendants' expressive speech. In fact, the injunction would apply equally to protests that support abortion, or indeed, to protests supporting or opposing any other cause. It is true that the injunction applies only to the defendants, but that is because it is only the defendants who have created a threat of harassment and intimidation. Thus, the injunction meets the content-neutral requirement.

### 2.

### Narrowly Tailored to Serve a Significant Government Interest

■ There is no doubt that the preliminary injunction is necessary to serve several significant governmental interests. As stated earlier, the evidence adduced at trial clearly establishes that defendants' "rescue" activities significantly increase the health risks associated with the medical procedures performed at the plaintiffs' clinics. "The government 'may properly assert important interests in safeguarding health' and 'in maintaining medical standards' as regards the performing of abortions." *Northeast Women's Center, Inc. v. McMonagle*, 939 F.2d 57, 63 (3d Cir.1991) (quoting *Roe v. Wade*, 410 U.S. at 154, 93 S.Ct. at 727). Further, the government "has a legitimate interest in seeing to it that an abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." *Roe v. Wade*, 410 U.S. at 150, 93 S.Ct. at 725. Thus, the Court finds that the injunction serves the significant governmental interest of ensuring that abortions are performed safely. *See Northeast Women's Center, Inc.*, 939 F.2d at 63; *Portland Feminist Women's Health Center*, 859 F.2d at 686.

In addition, the injunction effectuates the significant governmental interest of public safety. *Terry*, 886 F.2d at 1364. The injunction prohibits defendants from blocking traffic entering and leaving the clinics. It also prohibits defendants from abusing, grabbing, touching, pushing, shoving or crowding persons entering or leaving the clinics.

Finally, the injunction serves the significant governmental interest of ensuring "that the constitutional rights of one group are not sacrificed in the interest of the constitutional rights of another." *Terry*, 886 F.2d at 1364. While defendants have a First Amendment right to express their opposition to abortion, women entering the clinic have the constitutional rights to travel unimpeded and to choose to have an abortion. Thus, the Court has attempted to fashion an injunction that will ensure that the constitutional rights of both parties are protected to the fullest extent possible.

■ Having established that there are significant governmental interests at stake, the Court must next determine whether the injunction is "narrowly tailored" to meet these interests. Defendants have stipulated to the entry of an injunction against "blocking or obstructing" access to plaintiffs' health care facilities and trespassing on such premises for the purpose of "blocking or obstructing" access. While the Court's preliminary injunction encompasses the conduct covered by defendants' stipulation, it is more comprehensive in order to cover the full range of defendants' activities. The Court's preliminary injunction is better tailored to the evidence and addresses not only physical "blockades," but other "rescue" activities as well.

In crafting the injunction, the Court has been guided by the paramount need to maintain an atmosphere conducive to the health care functions of plaintiffs' facilities. As the Supreme Court has advised, in evaluating the need for and legitimacy of restrictions on expressive activity, courts must keep in mind the normal functions of the location in question and whether the nature of the demonstration activity is con-

ducive to or disruptive of normal activities. *Grayned,* 408 U.S. at 116, 92 S.Ct. at 2303. Here, in the context of health care facilities treating women who are already undergoing the stress normally associated with having an abortion, there is an attendant need for a calm, quiet, stress-free atmosphere. Defendants' noisy, disruptive, invasive, threatening and intimidating activities are clearly inappropriate in such a setting. The significant governmental interest inherent in providing safe medical care to the public justifies certain carefully drawn restrictions on defendants' expressive activities. *See Beth Israel Hosp. v. NLRB,* 437 U.S. 483, 507–08, 98 S.Ct. 2463, 2477, 57 L.Ed.2d 370 (1978); *Dallas Ass'n of Community Orgs. for Reform Now v. Dallas County Hosp. Dist.,* 670 F.2d 629, 632 (5th Cir.1982).

■ Paragraph (a) of the injunction is aimed at preventing defendants from obstructing and impeding access to plaintiffs' health care facilities. Paragraph (a) covers the full range of defendants' obstructive behavior including: obstructing and impeding access to and egress from the clinics, congregating in private driveways and parking lots, surrounding the cars of patients and staff as they try to enter the driveways and parking lots of the clinics, and crowding, shoving or interfering with patients and staff as they approach the clinic on foot. As the Second Circuit noted in *Terry,* there is simply no First Amendment right to impede or obstruct access to public or private buildings. *Terry,* 886 F.2d at 1364 (citations omitted). Likewise, there is no First Amendment right to picket in a private driveway or parking lot.

■ Paragraph (a) also enjoins trespassing on all areas of plaintiffs' health care facilities including parking lots and other surrounding property. This provision is necessary because of the uncontroverted evidence that defendants continuously trespass on the clinics' private property while they are demonstrating, picketing and "sidewalk counseling," as well as when they engage in physical "blockades." There is simply no First Amendment right to trespass upon private property, even

when access to that property may be the only, or most effective, way to reach the intended audience. *See Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (finding no constitutional right to engage in labor picketing in a shopping center, even though picketing in that location was the only effective way for the labor union to reach its intended audience).

Paragraph (b) of the preliminary injunction secures unfettered access to the clinics by setting dual "clear zones" of fifteen feet around entrances and fifteen feet around people and vehicles seeking access. The "clear zones" are necessary to ensure that people and vehicles seeking access to the clinics will not be impeded, and will be able to determine readily where the entrances are located. Further, the "clear zones" will prevent defendants from crowding patients and invading their personal space. The Supreme Court has upheld "clear zones" in other demonstration contexts. *See, e.g., Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (upholding a Washington D.C. ordinance prohibiting picketing within 500 feet of a foreign embassy); *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (upholding ban on picketing within 100 feet of a courthouse); *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (upholding ban on picketing within 100 feet of a jail).

The injunction's "clear zones" are not absolute. In an attempt to accommodate fully defendants' First Amendment rights, the Court, in paragraph (c) of the injunction, has made an exception to the "clear zones" for "sidewalk counselors." Paragraph (c) provides that a maximum of two "sidewalk counselors" may enter the fifteen foot "clear zones" around entrances and people approaching the clinics, for the purpose of counseling in a non-threatening manner. However, paragraph (c) also provides that once the targeted person or group of persons indicates, either verbally or non-verbally, that they do not wish to be counseled, the "sidewalk counselors" must "cease and desist" from counseling and move out of the fifteen foot "clear

zones." [12] This "cease and desist" provision is necessary in order to protect the right of people approaching and entering the facilities to be left alone.

 Defendants strenuously object to the "cease and desist" provision of the injunction. They argue that, because their "sidewalk counseling" occurs on a public sidewalk, they cannot be forced to cease communicating their message just because their audience may be unwilling to hear it. The Court, however, rejects this argument.

 There is no First Amendment right to communicate one's views to anyone, at any time, in any manner, or in any place that may be desired. *See Heffron*, 452 U.S. at 647, 101 S.Ct. at 2563. When speakers' interests conflict with those of unwilling listeners, "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." *Rowan v. United States Post Office Dep't*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970). "[N]o one has a right to press even 'good' ideas on an unwilling recipient." *Id.* at 738, 90 S.Ct. at 1491.

 When a case presents a conflict, as this one does, between the right to speak and the right to be left alone, the Supreme Court has held that the right of the unwilling listener to be left alone is paramount when that listener is a "captive audience." *See, e.g., Frisby*, 487 U.S. at 474, 108 S.Ct. at 2495; *Consolidated Edison Co. v. Public Service Comm'n of New York*, 447 U.S. 530, 542, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). The "captive audience" doctrine, simply stated, is that a listener has a right not to be exposed to an unwanted message in circumstances in which the communication cannot be avoided. *Frisby*, 487 U.S. at 488,

108 S.Ct. at 2504 (upholding local ordinance banning "focused" picketing of a single residence); *Lehman*, 418 U.S. at 298, 94 S.Ct. at 2714 (upholding ban on political messages on public buses because the need of riders on public transportation to get where they wanted to go made it practically impossible for them to avoid unwanted political messages); *Rowan*, 397 U.S. at 728, 90 S.Ct. at 1484 (upholding statute that allowed householder to require Postmaster General to order senders of "junk" mail to remove addressee's name from sender's mailing list); *Kovacs*, 336 U.S. at 77, 69 S.Ct. at 448 (upholding ban on amplified sound trucks because they are so intrusive that they made it impossible for people to escape their message).

 The "captive audience" doctrine is an essential component of First Amendment freedoms since the same interest in personal autonomy underlies both the right to speak and the right to be left alone. "The First Amendment in its respect for the conscience of the individual honors the sanctity of thought and belief. To think as one chooses, to believe as one wishes, are important aspects of the constitutional right to be let alone." *Public Util. Comm'n v. Pollak*, 343 U.S. 451, 468, 72 S.Ct. 813, 823, 96 L.Ed. 1068 (1952) (Douglas, J., dissenting) (Justice Douglas' dissenting position in *Pollak*, that a state authority had no right to broadcast radio messages onto public transit, became the holding of the majority of the Court in *Lehman*). The "captive audience" doctrine stems from the fact that it is possible "to jeopardize autonomy of thought by communication to parties who do not wish to receive a message. The personal right of a listener to refuse to hear a given message is jeopardized by the speaker who blocks the listener's path to communicate his message . . . ." Taylor, *I'll Defend to the Death Your Right to Say It . . . But Not to Me—The Captive Audience Corollary*

12. A similar "cease and desist" provision is included in the Court's TRO. There was testimony adduced at the hearings that defendants have attempted to circumvent this provision by using a "relay" system, *i.e.,* once the targeted person rejects the counseling of a particular "sidewalk counselor," another one steps forward and continues counseling. This "relay" system obviously violates the spirit, if not the letter, of the Court's TRO. Once the targeted person or group of persons rejects counseling, that rejection is applicable to all "sidewalk counselors."

*to the First Amendment,* 1983 S.Ill.Univ. L.J. 211, 215–16 (1983).

■ In general, the "captive audience" doctrine does not apply when the unwilling listeners or viewers are located on the public street or sidewalk because they can avoid the unwanted message simply by walking away or averting their eyes. *Erznoznik v. Jacksonville,* 422 U.S. 205, 211, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975); *Cohen v. California,* 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971). However, whenever someone cannot, as a practical matter, escape from the unwanted intrusion, the speaker's expressive activity can be restricted under the "captive audience" doctrine. *Frisby,* 487 U.S. at 487, 108 S.Ct. at 2504; *Lehman,* 418 U.S. at 298, 94 S.Ct. at 2714; *Rowan,* 397 U.S. at 728, 90 S.Ct. at 1484; *Kovacs,* 336 U.S. at 77, 69 S.Ct. at 448.

In this case, women seeking access to one of plaintiffs' clinics for the purpose of having an abortion are a "captive audience" for defendants' "pro-life" message. Women have a constitutional right to choose to have an abortion. In order to safely exercise that right, women must have access to licensed health care facilities that perform abortions. There are a limited number of such facilities in this area. Defendants are well aware of this fact and obviously target their message at women seeking access to these facilities. Defendants surround the facilities and force women seeking access to them to run a gauntlet of demonstrators, picketers and "sidewalk counselors." The evidence adduced at the hearings clearly shows that, even when women seeking access to the clinics signal their desire to be left alone, defendants continue to follow right alongside them and persist in communicating

their message. It is obvious, therefore, that women seeking access to plaintiffs' facilities cannot, as a practical matter, escape defendants' message. Defendants' aggressive conduct makes it impossible for women entering the clinics simply to avert their eyes or cover their ears in order to avoid receiving defendants' message. The only choice women have if they want to avoid the message is to forego their constitutional right to have an abortion. Thus, women entering plaintiffs' clinics are a "captive audience" for defendants' message and the "cease and desist" provision of the injunction is warranted.[13]

The Court notes that the "cease and desist" provision of the injunction is more limited in scope than other restrictions upheld in "captive audience" cases such as *Lehman* and *Kovacs.* In this case, the "cease and desist" provision shields only unwilling listeners from defendants' message. In *Lehman* and *Kovacs,* however, both willing and unwilling listeners were prevented from hearing the speakers' message. Thus, the Court's "cease and desist" provision advances the values of the marketplace of ideas by permitting listeners to exercise their autonomy to make their own determinations among competing ideas. Once a woman seeking access to one of the clinics has made a determination not to listen to defendants' message, defendants must respect her choice.

Paragraph (d) of the injunction prohibits defendants from using any loud speakers or sound amplification devices in order to disturb the patients and staff inside the clinics. The use of such equipment obviously disturbs the calm environment necessary for the rendering of safe health care.

In sum, the Court finds that the restrictions on defendants' expressive activities

---

**13.** If, in the future, the Court finds that the "cease and desist" provision is not obeyed, it will not hesitate to impose stricter restrictions on defendants' right to communicate with women entering the clinics. *See Portland Feminist Women's Health Center,* 859 F.2d at 681 (affirming, over First Amendment challenge, an injunction setting up a twenty-five foot clear zone around the entrance to the health care facility; no demonstrating of any sort, including counseling, could occur within this clear zone); *see*

*also Bering v. SHARE,* 721 P.2d 918 (Wash. 1986), *cert. dismissed,* 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987); *Chico Feminist Women's Health Center v. Scully,* 208 Cal.App.3d 230, 256 Cal.Rptr. 194 (1989); *Hirsh v. City of Atlanta,* 261 Ga. 22, 401 S.E.2d 530 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 75, 116 L.Ed.2d 49 (1991); *Planned Parenthood Ass'n of Cincinnati v. Project Jericho,* 52 Ohio St.3d 56, 556 N.E.2d 157 (1990).

contained in the injunction are reasonable in light of the functions of plaintiffs' health care facilities and the nature of defendants' past conduct. Further, these restrictions are narrowly tailored to meet several significant government interests, including the need to provide safe health care to women seeking abortions, public safety, and the need to balance the rights of women to choose to have an abortion with defendants' First Amendment rights.

### 3.
### Ample Alternative Channels for Communication

■ The Court's injunction leaves open ample alternative channels for communication of defendants' message. Defendants may still assemble near plaintiffs' clinics so long as they remain outside the fifteen foot "clear zones." They can still picket, carry signs, pray, sing or chant in full view of people going into the clinics or just passing by. If confined to the area fifteen feet away from the entrances of the clinics' driveways and parking lots, defendants and their picket signs will still be visible to people approaching the clinic and their message will still be conveyed.

Paragraph (c) of the injunction allows a maximum of two "sidewalk counselors" to approach people entering the clinics for the purpose of offering them counseling in a non-threatening manner as long as they "cease and desist" from such counseling if the person or group of people targeted indicate that they wish to be left alone. Once the target of the counseling indicates a desire to be left alone, the "sidewalk counselors" must move out of the fifteen foot "clear zone." Once outside the "clear zone," the "counselors" may resume their expressive activity in accordance with the preliminary injunction.

Furthermore, the injunction is intended not only to protect the rights of the women entering the clinics, but those of defendants as well. The injunction specifically states that "nothing in this Order shall be construed to limit defendants and those acting in concert with them from exercising their legitimate First Amendment rights...."

Thus, the Court finds that the injunction leaves defendants ample alternative means for communicating their message.

### D.

### Restriction on the Use of Cameras

■ Plaintiffs have requested that defendants be prohibited from photographing, or appearing to photograph, with either a still or moving picture camera, any persons entering or exiting plaintiffs' facilities. Plaintiffs argue that the taking of photographs and the videotaping of patients entering the clinics violates the patients' constitutional right to privacy and should be enjoined. There is no precedent, one way or the other, dealing with the taking of photographs or videotapes of patients entering abortion or family planning clinics, and the constitutional right to privacy. However, the Supreme Court has dealt with cases involving the conflict between the patient's right to privacy and physician reporting requirements of abortion information to state authorities. *See, e.g., Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 80, 96 S.Ct. 2831, 2846, 49 L.Ed.2d 788 (1976). These decisions evince a strong concern for protecting and maintaining the anonymity of women seeking and undergoing abortions.

In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 80, 96 S.Ct. 2831, 2846, 49 L.Ed.2d 788 (1976), the Supreme Court upheld a Missouri statute providing reporting and recordkeeping requirements for health care facilities and physicians performing abortions. The Court held that "[r]ecordkeeping and recording requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." *Id.* at 80, 96 S.Ct. at 2846. The Court found that, because the information to be reported under the Missouri statute was not overdone or burdensome and the records were kept strictly confidential by state public health

officials, the statute was not unconstitutional. *Id.*

In *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), the Court struck down a Pennsylvania law containing a detailed reporting provision for physicians performing abortions.[14] Although these reports were not public records in their original form, the law provided for public inspection and copying of the records after the physician's name was removed and replaced with a confidential identifying number. The Court held that the scope of the information required by the reporting provision and the information's availability to the public belied the state's assertion that it was advancing any legitimate interest. *Id:* at 766, 106 S.Ct. at 2181. The Court found that the reports required under the statute went "well beyond the health-related interests that served to justify the Missouri reports under consideration in *Danforth*." *Id.* The Court stated that "[t]he decision to terminate a pregnancy is an intensely private one that must be protected in a way that assures anonymity." *Id.* In support of this position, the Court quoted with approval Justice Stevens' concurring opinion in *Bellotti v. Baird*, 443 U.S. 622, 655, 99 S.Ct. 3035, 3054, 61 L.Ed.2d 797 (1979), that:

> It is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties.

*Id.* 476 U.S. at 766, 106 S.Ct. at 2181. The Court further found that, while the statute did not require the woman's name to be reported, the obvious purpose of the extreme reporting requirements was to identify women who obtained abortions. Thus, the Court concluded, the statute did not adequately protect the privacy interests of women having abortions and was therefore invalid.

*Thornburgh* and *Danforth* stand for the proposition that information gathering about women having abortions is permissible only if there is a legitimate need for such information and the confidentiality and privacy of the women are closely safeguarded. Based on the authority of *Thornburgh* and *Danforth,* a state could not, consistent with the right of privacy, maintain a file of photographs of women seeking abortion services without taking extraordinary precautions against public disclosure. Any risk of revelation of so uniquely identifying a piece of information as a photograph to anyone other than duly authorized public health authorities would certainly violate the aspect of the right to privacy that includes the right to choose to have an abortion.

It follows, therefore, that if the state cannot do what defendants here do, namely take and disclose photographs and videotapes of women seeking access to abortion services, without seriously infringing the constitutional right of privacy, then certainly defendants, pursuant to their § 1985(3) conspiracy, cannot collect and maintain a photographic record of women seeking access to abortion services. As explained in *Thornburgh* and *Danforth,* the decision to obtain an abortion "is an intensely private one that must be protected in a way that insures anonymity." *Id.* 476 U.S. at 766, 106 S.Ct. at 2181. It is unavoidable that, in exercising her right to have an abortion, a woman must momentarily travel on a public sidewalk or street in order to get to the doctor's office. However, this fact should not allow defendants to freely intrude upon a woman's right to privacy. What is particularly bothersome is that when the intruder is an individual rather than the government, the use of the photographs and videotapes is left to the sole discretion of the intruder with no concern for the well-being of the woman.

---

**14.** The reporting provision required physicians performing abortions to file with the state a report identifying the performing and referring physician by name and the facility where the abortion was performed; information about the woman's political subdivision and state of residence; her age, race, marital status, and number of pregnancies, and other information related to gestational age.

Defendants have suggested that, if the Court decides that some type of injunctive relief is appropriate with regard to the use of cameras, it should only enjoin defendants from: (1) disseminating the photographs and videotapes; and (2) making any effort to identify the patients revealed therein. Defendants argue that such an injunction would ensure the privacy of abortion patients and eliminate any danger of public exposure or identification.

Defendants' argument ignores the intimidating effect of cameras being present at the entrances of the clinics. As stated in the Court's Findings of Fact, defendants use still and video cameras as offensive weapons to intimidate women seeking access to the clinics. Defendants are well aware that women, especially younger women, seeking abortions are often terrified at the prospect of anyone, especially family members, finding out that they are having an abortion. Defendants attempt to capitalize on this fear by using cameras as a means to threaten and intimidate these women with the prospect that, if they go through with the abortion, their identities may be revealed.

The Court finds it helpful to draw an analogy between use of cameras in this case and the civil rights movement of the sixties. During the civil rights movement, segregationists congregated in front of schools and polling places with attack dogs and clubs in order to intimidate blacks into foregoing their constitutional rights to an integrated education and to vote. Here, defendants are attempting to prevent women from exercising their constitutional right to choose to have an abortion. However, instead of using dogs and clubs, defendants use cameras and the threat of exposure to scare and intimidate vulnerable women into foregoing their constitutional rights. While the immediacy and severity of the threat posed by the cameras is obviously less, the camera, like the attack dog, is just a tool used by defendants to intimidate women from exercising their constitutional rights and may be restricted without violating defendants' rights.

In sum, the privacy rights of women entering the clinics and the intimidating effect upon women of cameras being present outside the clinics, are factors that weigh heavily in favor of restricting defendants use of cameras in this case. However, while the Court finds that plaintiffs' request for an injunction against the use of cameras may be warranted, it will decline, at this time, to enjoin or restrain the use of cameras. As stated earlier, there is no clear precedent for such an injunction. The Court will therefore give defendants an opportunity to conform their activities consistent with the Court's concerns over the privacy rights of women entering the clinics and the intimidating effect of cameras being present outside the clinics. If, however, defendants continue to use cameras as offensive weapons to intimidate and harass women entering the clinics, the Court will not hesitate to restrict defendants' use of cameras.

### E.

### *Abstention*

Defendants have moved the Court to reconsider its Decision and Order dated October 29, 1990, denying defendants' motion to dismiss the action based on the abstention doctrine. Defendants assert that such reconsideration is appropriate in light of the Second Circuit's recent decision in *Temple of the Lost Sheep, Inc. v. Abrams*, 930 F.2d 178 (2d Cir.1991). The Court has reviewed *Temple of the Lost Sheep* and finds it inapplicable to this case. The plaintiff in *Temple of the Lost Sheep* was given a full and fair opportunity to litigate its federal claims in state court. *Id.* at 184. In this case, however, plaintiffs have not asserted any federal claims in the state court proceeding. Furthermore, for all intents and purposes, the state court proceeding is "dead in the water." Counsel for plaintiffs in that case has submitted an affidavit to this Court stating that "although no motion has been made to dismiss the action and no stipulation of discontinuance has been executed, the action is, for all practical purposes, abandoned." Thus, after reconsideration, the Court denies de-

fendants' motion for dismissal of the action based on the abstention doctrine.

## V.

### CONCLUSION

For the reasons stated, the Court grants plaintiffs' motion for a preliminary injunction. The preliminary injunction is attached as an Appendix to this Decision and shall also be filed under separate cover. Further, after reconsidering its Decision and Order dated October 29, 1990, the Court denies defendants' motion to dismiss the action based on the abstention doctrine.

It is so ordered.

### APPENDIX

### PRELIMINARY INJUNCTION

Upon consideration of the evidence introduced at a hearing held on plaintiffs' motion for a preliminary injunction, and at hearings on plaintiffs' motions to find defendants Nancy Walker, Bonnie Behn, Carla Rainero, Rev. Paul Schenck, Rev. Robert Schenck and Project Rescue in civil contempt for violations of this Court's Temporary Restraining Order, and upon consideration of the complaint and supporting documents, and upon consideration of defendants' stipulations pertaining to the entry of a preliminary injunction against certain conduct and to the binding nature of any preliminary injunction on all named individual and organizational defendants, it is hereby

ORDERED that defendants, the officers, directors, agents, and representatives of defendants, and all other persons whomsoever, known or unknown, acting in their behalf or in concert with them, and receiving actual or constructive notice of this Order, are:

1. Enjoined and restrained in any manner or by any means from:

(a) trespassing on, sitting in, blocking, impeding, or obstructing access to, ingress into or egress from any facility, including, but not limited to, the parking lots, parking lot entrances, driveways, and driveway entrances, at which abor-

tions are performed in the Western District of New York;

(b) demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities, or within fifteen feet of any person or vehicle seeking access to or leaving such facilities, except that the form of demonstrating known as sidewalk counseling by no more than two persons as specified in paragraph (c) shall be allowed;

(c) physically abusing, grabbing, touching, pushing, shoving, or crowding persons entering or leaving, working at or using any services at any facility at which abortions are performed; provided, however, that sidewalk counseling consisting of a conversation of a non-threatening nature by not more than two people with each person or group of persons they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling, and that if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling, and shall thereafter be governed by the provisions of paragraph (b) pertaining to not demonstrating within fifteen feet of persons seeking access to or leaving a facility. In addition, it is further provided that this right to sidewalk counseling as defined herein shall not limit the right of the Police Department to maintain public order or such reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site;

(d) using any mechanical loudspeaker or sound amplification device or making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee of a health care facility at which abortions are performed, nor shall any person make such

sounds which interfere with the rights of anyone not in violation of this Order; (e) attempting, or inducing, directing, aiding, or abetting in any manner, others to take any of the actions described in paragraphs (a) through (d) above; and it is further

ORDERED that nothing in this Order shall be construed to limit defendants and those acting in concert with them from exercising their legitimate First Amendment rights; and it is further

ORDERED that the defendant organizations and their officers and agents, and all individual defendants and those acting in concert with them, shall make a good faith effort to instruct all organizations and individuals they believe to be planning to participate in any of the activities enumerated above not to engage or participate in the activities enjoined in paragraphs (a) through (e) above;

2. IT IS FURTHER ORDERED that the failure to comply with this Order by any defendant or anyone acting in their behalf or in concert with them shall be subject to civil damages of $10,000 per day for the first violation of this Order and/or may subject them to criminal contempt proceedings; and it is further

ORDERED that each successive violation of this Order shall subject the contemnor to a civil contempt fine double that of the previous fine and/or criminal contempt proceedings; and it is further

ORDERED that any amounts collected thereunder shall be paid to the Plaintiff health care facility at which the violation occurred, or to the Registry of the Court if the targeted health care facility is not a Plaintiff; and it is further

ORDERED that each contemnor shall be jointly and severally liable for all attorney's fees and related costs incurred by plaintiffs in relation to the enforcement of this Order.

3. Violations of this Order shall be enforced by appropriate motion.

4. IT IS FURTHER ORDERED that the United States Marshal for the Western District of New York shall read this Order as set forth above in Paragraphs 1 and 2 in their entirety at the site of a demonstration or protest at a facility at which abortions are performed in the Western District of New York. Plaintiffs' counsel shall be responsible for notifying the Marshal in a timely manner of the location of such demonstration or protest activity.

5. It is the Court's intention that nothing contained in this Order shall supersede or diminish the obligation of local and state law enforcement authorities to fulfill their duties and responsibilities in enforcing state laws and local ordinances.

6. This Order shall remain in full force and effect until modified by further Order, or until final resolution by this Court of the claims for permanent injunctive relief in the above captioned matter.

It is so ordered.