PRO–CHOICE NETWORK, of Western New York, Buffalo Gyn Women Services, Erie Medical Center, Paul J. Davis, M.D., Shalom Press, M.D., Barnett Slepian, M.D., Plaintiffs–Appellees,

v.

Rev. Paul SCHENCK, Dwight Saunders, Defendants–Appellants,

Project Rescue Western New York, Operation Rescue, James L. Evans, Rev., Ted Cadwallader, Rev., David Anderson, Jeffrey Baran, Brian Bayley, Bonnie Behn, Ronald Breymeier, Gilbert Certo, Scott Chadsey, Kim Day, Constance Debo, Mark Dent, Wayne Dent, Paul Diemert, Joan Giangreco, Delores Glaser, Carmelina Golba, Kevin Golba, Linda Hall, Nancy Hall, Thomas Hall, Daniel Hamlin, Rev., James Handyside, Pamela Huffnagle, Donna Johanns, Eric Johns, Neal Kochis, Paulette Likoudis, Charles

McGuire, Christopher Morrow, Annemarie Nice, Nicholas Pukalo, Carla Rainero, Thomas Riley, Patricia Ostrander, Linda Ross, David Smith, Mark Sterlace, Joyce Strigel, John Thomann, John Tomasello, Paul Waldmiller, Jr., Nancy Walker, Leonard Winter, Horace Wolcott, John Does, Jane Does, the last two names being fictitious names, the real names of said defendants being presently unknown to plaintiffs, said fictitious names being intended to designate organizations or persons who are members of defendant organizations and others acting in concert with any of the defendants who are engaging in, or intend to engage in the conduct complained herein, Project Life of Rochester, Gerald Crawford, David Long, Defendants.

v.

PROJECT RESCUE WESTERN NEW YORK, Operation Rescue, Project Life of Rochester, Paul Schenk, James L. Evans, Ted Cadwallader, Dwight Saunders, David Anderson, Jeffrey Baran, Brian Bayley, Bonnie Behn, Ronald Breymeier, Gilbert Certo, Scott Chadsey, Kim Day, Constance Debo, Mark Dent, Wayne Dent, Paul Diemert, Joan Giangreco, Delores Glaser, Carmelina Golba, Kevin Golba, Linda Hall, Nancy Hall, Thomas Hall, Daniel Hamlin, Donna Johanns, James Handyside, Pamela Huffnagle, Eric Johns, Neal Kochis, Paulette Likoudis, Charles McGuire, Christopher Morrow, Annemarie Nice, Nicholas Pukalo, Carla Rainero, Thomas Riley, Patricia Ostrander, Linda Ross, David Smith, Linda Smith, Mark Sterlace, Joyce Strigel, John Thomann, John Tomasello, Paul Waldmiller, Jr., Nancy Walker, Leonard Winter, Horace Wolcott, Gerald Crawford, David Long, John

Does, Jane Does, the last two being fictitious names, the real names of said defendants being presently unknown to plaintiffs, said fictitious names being intended to designate organizations or persons who are members of defendant organizations, and others acting in concert with any of the defendants who are engaging in, or intend to engage in, the conduct complained of herein, Defendants–Appellants.

Nos. 1215, 1310, Dockets 92–7302, 93–7918.

United States Court of Appeals,
Second Circuit.

Argued March 24, 1994.

Decided Sept. 6, 1994.

Vincent P. McCarthy, Joseph P. Secola, New Milford, CT (McCarthy & Secola, Jay Alan Sekulow, James M. Henderson, Mark N. Troobnick, Byron J. Babione, American Center for Law and Justice, of counsel), for appellants Schenck and Saunders in No. 92–7302.

Laurence D. Behr, Buffalo, NY, A. Lawrence Washburn, Jr., New York City, of counsel, for appellants in No. 93–7918.

Lucinda M. Finley, Buffalo, NY, for appellees.

Before OAKES, MESKILL and ALTIMARI, Circuit Judges.

MESKILL, Circuit Judge:

The principal issue in these appeals is the validity of a preliminary injunction issued by the United States District Court for the Western District of New York, Arcara, J.[1]

---

1. The pertinent provisions of the preliminary injunction provide:

ORDERED that defendants, the officers, directors, agents, and representatives of defendants, and all other persons whomsoever, known or unknown, acting in their behalf or in concert with them, and receiving actual or constructive notice of this Order, are:

1. Enjoined and restrained in any manner or by any means from:

(a) trespassing on, sitting in, blocking, impeding, or obstructing access to, ingress into or egress from any facility, including, but not limited to, the parking lots, parking lot entrances, driveways, and driveway entrances, at which abortions are performed in the Western District of New York;

(b) demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities, or within fifteen feet of any person or vehicle seeking access to or leaving such facilities, except that the form of demonstrating known as sidewalk counseling by no more than two persons as specified in paragraph (c) shall be allowed;

(c) physically abusing, grabbing, touching, pushing, shoving, or crowding persons entering or leaving, working at or using any services at any facility at which abortions are performed; provided, however, that sidewalk counseling consisting of a conversation of a non-threatening nature by not more than two people with each person or group of persons they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling, and

In No. 92–7302, the appellants appeal from the order issuing the injunction, *Pro–Choice Network of Western New York v. Project Rescue Western New York*, 799 F.Supp. 1417 (W.D.N.Y.1992) (*Pro–Choice I*); in No. 93–7918, the appellants appeal from the district court's denial of a motion to vacate the injunction, *Pro–Choice Network of Western New York v. Project Rescue Western New York*, 828 F.Supp. 1018 (W.D.N.Y.1993) (*Pro–Choice II*). For the reasons stated below, we affirm in part and reverse in part in *Pro–Choice I*, and we affirm in *Pro–Choice II*.

## BACKGROUND

Both appeals arise out of the same underlying case, which commenced on September 24, 1990, when the plaintiffs filed a suit against the defendants alleging, primarily, that the defendants were engaged in a conspiracy to deprive women seeking abortions the privileges and immunities of national citizenship and the equal protection of the laws. The plaintiffs (collectively "Pro–Choice") include an organization, Pro–Choice Network of Western New York, that seeks to ensure legal access to abortion, as well as individual doctors and clinics in western New York that provide health care services, including the performance of abortions. The defendants (collectively "Project Rescue") are various individuals and organizations, including Project Rescue Western New York, that oppose abortion and have engaged in demonstrations at or near certain abortion clinics in western New York.

Pro–Choice's conspiracy claim against Project Rescue, which alleged that Project Rescue sought to violate women's constitutional rights to seek abortion and to travel, was predicated on the first clause of 42 U.S.C. § 1985(3). That provision states in pertinent part:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Pro–Choice's complaint also alleged six pendent state law claims against Project Rescue, including trespass and violation of New York Civil Rights Law § 40–c (section 40–c).[2]

that if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling, and shall thereafter be governed by the provisions of paragraph (b) pertaining to not demonstrating within fifteen feet of persons seeking access to or leaving a facility. In addition, it is further provided that this right to sidewalk counseling as defined herein shall not limit the right of the Police Department to maintain public order or such reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site;

(d) using any mechanical loudspeaker or sound amplification device or making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee of a health care facility at which abortions are performed, nor shall any person make such sounds which interfere with the rights of anyone not in violation of this Order;

(e) attempting, or inducing, directing, aiding, or abetting in any manner, others to take any of the actions described in paragraphs (a) through (d) above; and it is further

. . . .

Ordered that the defendant organizations and their officers and agents, and all individual defendants and those acting in concert with them, shall make a good faith effort to instruct all organizations and individuals they believe to be planning to participate in any of the activities enumerated above not to engage or participate in the activities enjoined in paragraphs (a) through (e) above.

2. New York Civil Rights Law § 40–c provides in pertinent part:

1. All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.

2. No person shall, because of ... sex ..., be subjected to any discrimination in his civil rights, or to any harassment ... in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state.

New York Civil Rights Law § 40–d provides the remedies for violations of section 40–c. It states in pertinent part:

Pro–Choice sought declaratory and injunctive relief, as well as compensatory and punitive damages.

Simultaneously with the filing of its complaint, Pro–Choice moved, pursuant to Fed. R.Civ.P. 65(b), for a temporary restraining order (TRO) prohibiting Project Rescue from conducting an abortion clinic blockade scheduled for September 28, 1990. After a hearing, the district court granted the TRO, enjoining Project Rescue from blockading any of the plaintiff medical facilities and from harassing patients or staff members as they entered or exited those facilities. In accordance with the TRO, Project Rescue held a peaceful demonstration instead of conducting a blockade on September 28.

With the consent of the parties, the district court extended the TRO pending the parties' briefing on whether the TRO should be converted into a preliminary injunction. During this period of extension, Project Rescue moved to dismiss or to stay the action pursuant to the abstention doctrine on the ground that a parallel proceeding was pending in state court. After a hearing, the district court denied the motion. On Project Rescue's motion for reconsideration, the district court agreed to reconsider the denial, but reaffirmed its previous decision on the ground that the pending state action was " 'dead in the water.' " *Pro–Choice I,* 799 F.Supp. at 1439. Also during the period in which the TRO was extended, Pro–Choice filed motions for civil contempt against several individual defendants and against Project Rescue itself. The district court ultimately granted these motions. *See Pro–Choice II,* 828 F.Supp. at 1028–29; *see also Pro–Choice Network of Western New York v. Walker,* 994 F.2d 989 (2d Cir.1993) (*Pro–Choice III* ) (dismissing for lack of appellate jurisdiction appeals by three individuals against whom motions for civil contempt were granted).

As to whether the TRO should be converted into a preliminary injunction, the district court heard arguments and took evidence, and made numerous factual findings. *See Pro–Choice I,* 799 F.Supp. at 1424–27. The court first found that Project Rescue utilizes several different demonstration techniques: actual physical blockades of abortion facilities, constructive blockades of such facilities, and sidewalk counseling. The court then noted that, because Project Rescue had conceded that the physical blockades could be enjoined and in fact had not engaged in any physical blockades of clinics since the issuance of the TRO enjoining such blockades, the court would focus on the other two demonstration techniques. *Id.* at 1424 n. 5.

The district court found that constructive blockades are designed to prevent access to abortion clinics by intimidation or dissuasion and by physical obstruction of people trying to enter the clinics. Moreover, the court found that constructive blockades involve not only "forcing patients to run a gauntlet of harassment and intimidation," but also picketing, congregating near driveway entrances, making "loud and disruptive noises," yelling, pushing, and shoving. *Id.* at 1424. The court found that these constructive blockade techniques cause stress and physical injury to clinic patients and employees and disrupt the atmosphere necessary for providing medical care.

The court also found that sidewalk counseling, in which demonstrators seek to persuade a patient not to have an abortion, often becomes a "charged encounter" because of "the highly emotional nature of the abortion issue." *Id.* at 1425. These encounters involve harassment, badgering, intimidation and yelling. The court noted that some of the defendants had persisted in sidewalk counseling despite having been arrested for harassment. *Id.* at 1424–25.

The district court also made numerous findings regarding the health effects of Project Rescue's demonstrations on women seeking services at the abortion clinics. The court found that "[w]omen who have been the

Any person who shall violate any of the provisions of the foregoing section ... or who shall aid or incite the violation of any of said provisions shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hun-

dred dollars, to be recovered by the person aggrieved thereby in any court of competent jurisdiction.... In addition, any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a class A misdemeanor.

target of 'sidewalk counseling' or other 'rescue' demonstrations usually enter the medical facilities visibly shaken and severely distressed." *Id.* at 1427. The court noted that the stress associated with being the subject of sidewalk counseling exacerbates the stress that often accompanies the decision to seek an abortion, thus increasing the risks associated with having an abortion. *Id.* Also, because some women find it necessary to reschedule their appointments or postpone necessary follow-up procedures because of Project Rescue's demonstrations, delays are created that may also lead to increased medical risks. *Id.*

On the basis of these facts, the district court found that women seeking access to the plaintiff medical facilities would suffer irreparable harm from Project Rescue's activities if no injunction issued. *Id.* at 1428. Moreover, the court found that Pro–Choice had demonstrated a likelihood of success on the merits of its section 1985(3) claim based both on the right to travel and on the right to seek an abortion. In light of the finding of a likelihood of success on the section 1985(3) claim, the district court concluded that Pro–Choice had, "by definition," also established a likelihood of success on the section 40–c claim. *Id.* at 1431. Finally, the court found that Pro–Choice had demonstrated a likelihood of success of the merits of its state law trespass claim. Having thus found that Pro–Choice had made the requisite showing, *see Fireman's Fund Ins. Co. v. Leslie & Elliott Co.,* 867 F.2d 150, 151 (2d Cir.1989), the court issued a preliminary injunction.

In an effort to ensure the constitutionality of the injunction, the district court carefully reviewed the terms of the injunction pursuant to relevant First Amendment considerations. The court noted that the then-prevailing test for restrictions on the time, place and manner of expression required that the restriction be content neutral and narrowly tailored to serve a significant government interest, and that it leave open ample alternative channels of communication. *Pro–Choice I,* 799 F.Supp. at 1432 (citing *Frisby*

*v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)).

Applying this test, the court first found that the preliminary injunction was content neutral because it "makes no mention whatsoever of abortion or any other substantive issue" and regulates only "when, where and how defendants may speak." *Id.* at 1433. The court also found that the injunction would apply equally to people protesting or supporting abortion and to demonstrators for or against other causes, a finding vigorously contested by Project Rescue.

The court then determined that the injunction served three significant government interests: (1) the interest in ensuring that abortions are performed safely; (2) the interest in public safety; and (3) the interest in ensuring that the constitutional rights of one group are not sacrificed for the constitutional rights of another group. *Id.* The court found that the injunction was narrowly tailored to meet these interests. Finally, the court determined that the injunction provided Project Rescue ample alternative avenues of communication because it allowed Project Rescue to engage in many demonstration activities outside the fifteen foot clear zone. *Id.* at 1437.

Two individual defendants, Paul Schenck and Dwight Saunders,[3] appealed from the district court's order issuing the preliminary injunction. *See* 28 U.S.C. § 1292(a)(1). During the pendency of the appeal, the Supreme Court decided *Bray v. Alexandria Women's Health Clinic,* ⸺ U.S. ⸺, ⸺–⸺, 113 S.Ct. 753, 759–60, 122 L.Ed.2d 34 (1993), holding that a section 1985(3) claim, which requires a showing of some invidiously discriminatory, class-based animus, could not be sustained where the only class-based animus alleged was animus against women as evidenced by opposition to abortion.

Project Rescue thereafter moved in the district court for dismissal of the complaint and for vacatur of the injunction, contending

---

**3.** For convenience, we will refer to these appellants, as well as the appellants in *Pro–Choice II,* collectively as "Project Rescue."

that *Bray* compelled the dismissal of Pro–Choice's section 1985(3) claim and that, after dismissal of that sole federal claim, dismissal of the pendent state claims and vacatur of the injunction were also warranted. By stipulation of the parties, the appeal from the issuance of the injunction was dismissed without prejudice to reinstatement by any party within twenty days of the district court's resolution of the motion to dismiss the claims and to vacate the injunction. *See Pro–Choice II*, 828 F.Supp. at 1028 n. 9.

The district court granted Project Rescue's motion in part, dismissing the section 1985(3) claim with leave to amend the complaint, but refused to dismiss the state law claims or to vacate the injunction. In refusing to vacate the injunction, the court stated that "[t]he Court's decision to exercise pendent jurisdiction over the state-law claims, regardless of the ultimate disposition of the § 1985(3) claim, leaves without question the viability and continued enforceability of the preliminary injunction." *Pro–Choice II*, 828 F.Supp. at 1032. Project Rescue subsequently appealed from the district court's refusal to vacate the injunction, *see* 28 U.S.C. § 1292(a)(1), and the appeal from the issuance of the injunction was reinstated.

Because they arise from the same underlying case, we consider Project Rescue's two appeals together. In the appeal relating to the issuance of the injunction, No. 92–7302, Project Rescue contends that: (1) no injunction is permitted under section 1985(3); and (2) the injunction unconstitutionally restricts expression that is protected by the First Amendment. Project Rescue does not challenge the portion of the injunction that prohibits it from physically blockading the abortion clinics. In the appeal relating to the district court's denial of the motion to vacate the injunction, No. 93–7918, Project Rescue contends that: (1) no injunction is permitted under section 40–c and the restrictions on expression imposed by the injunction exceed that permitted pursuant to the state law trespass claim; (2) the district court should have limited the injunction's contempt fines

to the amount allowed under New York law; and (3) the court should have abstained from adjudicating this case.

After oral argument in these cases, the Supreme Court decided *Madsen v. Women's Health Center*, —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), in which the Court approved in part and disapproved in part an injunction prohibiting abortion opponents from engaging in certain activities near an abortion clinic in Melbourne, Florida. We allowed the parties to submit letter briefs addressing the effect of *Madsen* on the issues before us.[4]

## DISCUSSION

### I. *Standing*

■ Project Rescue contends that Pro–Choice lacks standing to seek an injunction against Project Rescue's activities. The basis of Project Rescue's argument is the novel proposition that an injunction restraining the time, place and manner of protected expression is inappropriate in cases involving private litigants because only government interests can justify such an injunction. Project Rescue maintains that Pro–Choice, a private entity, has standing to assert only its own private interests and, therefore, cannot assert the government interests required to support a restraint on expression. We reject Project Rescue's contention because it improperly collapses two distinct issues: whether a litigant has standing to assert certain substantive claims against another party and whether an injunction restricting activity protected by the First Amendment is warranted.

Here, Pro–Choice had standing to assert its claims against Project Rescue because Pro–Choice alleged in its complaint that Project Rescue's activities caused Pro–Choice to suffer a concrete injury, that there was an immediate threat that Project Rescue would continue its allegedly injurious activities, and that the injuries were likely to be redressed

---

**4.** In its letter brief, Project Rescue challenged, for the first time, the validity of the injunction's civil contempt provisions, arguing that any violation of the injunction should be treated as criminal, rather than civil, contempt. This issue is not properly before us on this appeal and we do not consider it.

by injunctive relief. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *City of Los Angeles v. Lyons,* 461 U.S. 95, 110–11, 103 S.Ct. 1660, 1669–70, 75 L.Ed.2d 675 (1983). Having thus established its standing to maintain its claims against Project Rescue, Pro–Choice was entitled to argue that injunctive relief was a proper remedy because certain government interests would be furthered by the issuance of such relief. Project Rescue's standing argument thus fails.

## II. *Abstention*

■ Project Rescue contends, in its appeal from the district court's refusal to vacate the injunction, that the court should have abstained from adjudicating this case in deference to an identical, ongoing state court proceeding. This claim, however, is not properly before us. Indeed, Project Rescue did not seek to raise the abstention issue in the district court as part of the motion to dismiss and to vacate. Moreover, because the district court did consider the abstention issue in the course of granting the preliminary injunction, *see Pro–Choice I,* 799 F.Supp. at 1439, Project Rescue could have challenged the district court's decision not to abstain in its appeal from the issuance of the preliminary injunction. Having failed to do that, Project Rescue has waived its challenge to the district court's refusal to abstain.

■ Furthermore, we reject Project Rescue's challenge, raised in the midst of its "abstention" claim, to the district court's decision not to relinquish jurisdiction over the pendent state law claims even after dismissing the only federal claim. The district court carefully and thoroughly analyzed the appropriate considerations, *Pro–Choice II,* 828 F.Supp. at 1027–32, and its determination to retain jurisdiction over the pendent state law claims accords with the governing case law. *See, e.g., Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349–50 & n. 7, 108 S.Ct. 614, 618–19 & n. 7, 98 L.Ed.2d 720 (1988); *Enercomp, Inc. v. McCorhill Publishing,* 873 F.2d 536, 545–46 (2d Cir.1989).

## III. *Scope of the Injunction*

Project Rescue wages several attacks on the scope of the injunction. First, it alleges that the district court erred in refusing to vacate the preliminary injunction because (a) the injunction imposes impermissibly high contempt fines, (b) the injunction's substantive restrictions on expression go beyond that which is permissible to redress repeated trespasses, and (c) the section 40–c claim no longer states a claim upon which relief can be granted. Second, Project Rescue contends that the district court erred in issuing the injunction because (a) certain provisions violate the First Amendment, and (b) certain provisions are vague and, therefore, violate due process. Finally, Project Rescue asserts a variety of additional contentions challenging the validity of the injunction. We address Project Rescue's claims in turn.

### A. *State Law Limits on Injunction*

■ Project Rescue contends that several aspects of the injunction exceed that which is permissible pursuant to New York law. First, Project Rescue asserts that the contempt fines prescribed in the injunction are higher than is allowable pursuant to New York state law. Project Rescue also contends that, because section 40–c does not authorize injunctive relief and the only permissible basis for the injunction is, therefore, the trespass claim, the case must be remanded to the district court to allow appropriate "tailoring" of the injunction to the trespass claim. Project Rescue further claims that, after *Bray,* the section 40–c claim no longer states a claim upon which relief can be granted and, therefore, that the injunction is improper. We decline to address the merits of any of these contentions for the reasons that follow.

In the district court, Project Rescue sought the vacatur of the preliminary injunction on the ground that the sole federal claim should be dismissed, that the pendent state law claims should then also be dismissed because the exercise of pendent jurisdiction would be improper after dismissal of the federal claim, and that, with no claim remaining in the case, the injunction should be vacated. Project Rescue did not, however,

assert in the alternative that the district court should modify the injunction to reduce the contempt fines or to limit it to the trespass claim alone, or that the court should dismiss the section 40-c claim for failure to state a claim. Project Rescue thus gave the district court no reason to consider, in the course of making its decision on the motion to vacate, the claims that it now asserts. In our view, the district court should have the first opportunity to determine, on proper application of the parties, both whether the injunction exceeds its state law basis and whether, if so, other state law or federal law bases exist for this injunction. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Greene v. United States,* 13 F.3d 577, 586 (2d Cir.1994). Accordingly, we do not address Project Rescue's state law challenges to the injunction and do not disturb, on any of those grounds, the district court's refusal to vacate the injunction.

### B. *Constitutional Limits on Injunction*
#### 1. *First Amendment*

■ Project Rescue's next claim regarding the scope of the injunction is that certain provisions infringe on its First Amendment right to freedom of speech.[5] For the reasons stated below, we conclude that, with two exceptions, the provisions of the preliminary injunction comply with the First Amendment.

Pro–Choice properly acknowledges that the challenged provisions of the preliminary injunction reach both expressive conduct, such as demonstrating and picketing, and speech that the First Amendment protects. *See Frisby,* 487 U.S. at 479, 108 S.Ct. at 2499 (ordinance that prohibits picketing on an issue of public concern "operates at the core of the First Amendment"); *Heffron v. International Society for Krishna Consciousness,*

452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981) (oral and written expressions of religious views fall within protection of First Amendment); *see also Pro–Choice I,* 799 F.Supp. at 1432 ("[t]here is no question that defendants' activities constitute a form of political speech protected by the First Amendment"). Moreover, the injunction reaches constitutionally protected expression in a traditional public forum: public sidewalks. *Frisby,* 487 U.S. at 480, 108 S.Ct. at 2500; *United States v. Grace,* 461 U.S. 171, 177–80, 103 S.Ct. 1702, 1706–09, 75 L.Ed.2d 736 (1985); *Heffron,* 452 U.S. at 651, 101 S.Ct. at 2565–66; *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1363 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *see also Pro–Choice I,* 799 F.Supp. at 1432.

■ Crucial to our review of the constitutionality of the preliminary injunction is the determination whether it is content based or content neutral, that is, whether it is justified with or without reference to the content of the regulated expression. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 381–82, 384–86, 112 S.Ct. 2538, 2542, 2544, 120 L.Ed.2d 305 (1992); *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989). In making this determination, "we ... look to the government's purpose as the threshold consideration." *Madsen,* —— U.S. at ——, 114 S.Ct. at 2523.

■ Contrary to Project Rescue's contention, the injunction is not properly considered content based merely because it applies to abortion opponents and not to abortion rights supporters. The Supreme Court recently stated that the fact "[t]hat petitioners all share the same viewpoint regarding abortion does not *in itself* demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the [injunctive] order." *Id.* (emphasis added); *see also*

---

5. As part of its First Amendment challenge to the preliminary injunction, Project Rescue contends that the injunction constitutes a prior restraint and that, as such, it is presumptively unconstitutional. The Supreme Court recently disposed of this argument, holding that a content neutral injunction that restricts, but does not absolutely bar, particular expression is not a prior restraint. *See Madsen,* —— U.S. at —— n. 2, 114 S.Ct. at

2524 n. 2 (citing *Vance v. Universal Amusement Co.,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980) (per curiam); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). Because, as discussed below, the injunction in this case is content neutral and is not an absolute bar on particular expression, it is not an invalid prior restraint.

*New York State Nat'l Org. for Women*, 886 F.2d at 1363. Rather, the injunction was imposed on Project Rescue because it was creating the threat of irreparable injury to women seeking abortions. *See Pro–Choice I*, 799 F.Supp. at 1428; *see also Madsen*, —— U.S. at ——, 114 S.Ct. at 2523.

■ Our inquiry into whether the injunction in this case is content based or content neutral does not end here, however, because we must still determine whether the justifications underlying the issuance of the injunction refer to the content of the restricted expression. *See R.A.V.*, 505 U.S. at 384–86, 112 S.Ct. at 2544; *Ward*, 491 U.S. at 791, 109 S.Ct. at 2753–54. One justification cited by the district court was that women seeking services at the plaintiff facilities would be denied unimpeded access to those services in the absence of a preliminary injunction restraining Project Rescue's activities. *Pro-Choice I*, 799 F.Supp. at 1428. The district court also justified the injunction on the ground that, without an injunction, prospective patients at the facilities, as well as staff members, would suffer adverse effects, especially stress and anxiety, from Project Rescue's activities, causing an increase in the risks associated with the abortion procedure. *Id.* Because the purpose of ensuring access to services at the facilities does not refer to the content of the restricted expression and, therefore, constitutes a valid basis for the injunction, we need not determine whether the purpose of avoiding stress and anxiety to patients is itself content based.

■ We note, however, that a government regulation of expression is considered content based if it seeks to prevent the listeners of that expression from being offended by the message. *See Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988). On the other hand, a government regulation of expression would probably be considered content neutral if its purpose is to avoid a violent audience reaction to the message. *See Texas v. Johnson*, 491 U.S. 397, 407 n. 4, 109 S.Ct. 2533, 2541 n. 4, 105 L.Ed.2d 342 (1989). To the extent that, in this case, an injunction's purpose of avoiding stress to prospective clinic patients is closer to avoiding offense, *see Boos*, 485 U.S. at 321,

108 S.Ct. at 1163–64, than to avoiding violence, *see Johnson*, 491 U.S. at 407 n. 4, 109 S.Ct. at 2541 n. 4, that purpose might constitute a justification that impermissibly refers to content. We do not decide this issue, however, because the injunction here is validly based on the content neutral purpose of ensuring access to services at facilities where abortions are performed.

We now proceed to apply the Supreme Court's newly enunciated test for determining the constitutionality of content neutral injunctions restricting expression in a public forum: "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen*, —— U.S. at ——, 114 S.Ct. at 2525. As explained by the Court, this new test is more rigorous than the traditional test that has been applied to regulations of the time, place and manner of expression. *See, e.g., Clark*, 468 U.S. at 293, 104 S.Ct. at 3069 (holding that test for time, place and manner restrictions is whether the restriction is content neutral, is narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication). More searching scrutiny of content neutral injunctions restricting expression, as opposed to content neutral legislation restricting expression, is appropriate because of the "greater risks of censorship and discriminatory application" associated with injunctions and the " 'effective practical guaranty against arbitrary and unreasonable government' " inherent in legislation that is to be generally applied. *Madsen*, —— U.S. at ——, 114 S.Ct. at 2524 (quoting *Railway Express Agency v. New York*, 336 U.S. 106, 112–13, 69 S.Ct. 463, 466–67, 93 L.Ed. 533 (1949)).

■ In applying the *Madsen* test, we first analyze whether the government interests identified by the district court—safe performance of abortions, public safety, and protection of one group's constitutional rights without sacrificing another group's constitutional rights—are significant. We conclude that they are. As the Court recognized in *Madsen*, the government has strong interests both "in ensuring the public safety and order" and "in protecting a woman's freedom

to seek lawful medical or counseling services in connection with her pregnancy." *Id.* at ——, 114 S.Ct. at 2526. Moreover, it is axiomatic that the government has a significant interest in protecting the constitutional rights of all persons and groups. Accordingly, the government interests identified by the district court are "quite sufficient to justify an appropriately tailored injunction to protect them." *Id.*

We now examine each of the challenged provisions of the injunction to determine whether, under the new *Madsen* test, it passes First Amendment muster. First, Project Rescue challenges the establishment, in paragraph 1(b) of the injunction, of a fifteen foot "bubble zone" around facilities in the Western District of New York at which abortions are performed. The bubble zone provision prohibits all demonstrations within fifteen feet of such facilities' doorways, doorway entrances, driveways, driveway entrances, and parking lot entrances; it also prohibits any demonstrations within fifteen feet of any person or vehicle seeking access to the clinics. The injunction allows two demonstrators, however, to enter the bubble zone for the exclusive purpose of engaging in sidewalk counseling, which is characterized as a non-threatening conversation with a prospective clinic patient seeking to persuade the patient not to have an abortion.

In determining whether the bubble zone provision "burden[s] no more speech than necessary," *id.* at ——, 114 S.Ct. at 2525, to serve the identified significant government interests, we note first that the bubble zone does not effect a complete ban on all expression within the zone; rather, the injunction permits a limited exception for two persons at a time to enter the bubble zone for the purpose of engaging in sidewalk counseling, until such time as the person being counseled indicates a desire that the counseling cease. Moreover, the radius of the bubble zone is the relatively short distance of fifteen feet. *Cf. id.* at ——, 114 S.Ct. at 2527 (upholding thirty-six foot bubble zone around abortion clinic property).

On the other hand, we must recognize that the bubble zone constitutes a substantial restriction on Project Rescue's activities. Because other provisions of the injunction restrain Project Rescue from obstructing or in any way impeding access to the clinics, parking lots and driveways, the bubble zone provision apparently forbids conduct even beyond that which would obstruct or impede access. For example, as we read the injunction, the bubble zone provision prohibits a defendant from standing on a sidewalk in front of the clinic, within fifteen feet of the entrance, holding a sign imprinted with an antiabortion message.

Moreover, the need for this prohibition, which goes beyond preventing the obstruction of access, is not established on this record. As noted by the district court, Project Rescue complied with the TRO by refraining from engaging in physical blockades of the clinics. Although approximately six individuals were held in civil contempt for violating the TRO by engaging in such conduct as impeding and hindering access to the facilities or upsetting prospective patients, *see Pro-Choice III*, 994 F.2d at 992–93, it appears from the record that, of these individuals, only some had engaged in obstructive activities. Without more evidence of Project Rescue's disregard for the court's order to refrain from obstructing or impeding access, we are reluctant to approve a restriction of First Amendment rights such as that effected by the bubble zone provision.[6]

The Supreme Court's analysis of the thirty-six foot buffer zone at issue in *Madsen* provides an instructive contrast. There, an injunction established an absolute ban on "congregating, picketing, patrolling, demonstrating or entering" any property within thirty-six feet of the clinic's property line. The Court noted that "[t]he state court [that issued the injunction] was convinced that allowing the petitioners to remain on the clin-

---

**6.** Although Pro-Choice has brought to our attention several instances of violations of the preliminary injunction, resulting in criminal contempt convictions, we note that such evidence is outside the record to which we may look for support for the preliminary injunction. The district court could, however, consider such evidence now in response to any motion the parties might make regarding the current scope of the injunction's prohibitions.

ic's sidewalk and driveway was not a viable option *in view of the failure of the first [less restrictive ] injunction to protect access."* *Madsen,* —— U.S. at ——, 114 S.Ct. at 2527 (emphasis added). The Court further stated that "[w]e ... bear in mind the fact that the state court originally issued a much narrower injunction, providing no buffer zone, and that this order *did not succeed in protecting access to the clinic." Id.* (emphasis added). Here, by contrast, there is no indication that the TRO violations were so pervasive as to undermine the district court's general goal of ensuring access to abortion facilities.

We conclude here that, unless and until the record supports a finding that the prohibition against obstructing or impeding access to the facilities is ineffective to protect access, the bubble zone provision does not pass constitutional muster. Accordingly, the bubble zone provision imposed in paragraph 1(b) of the injunction sweeps too broadly and burdens more of Project Rescue's constitutionally protected expression than is necessary to protect the government's significant interests in the safe performance of abortions, in public safety and in protecting all persons' constitutional rights. Our holding is limited, however, to the factual record before us; a different record revealing greater intransigence by Project Rescue might well support a more restrictive injunction, as in *Madsen.*

█ Project Rescue also challenges the so-called cease and desist requirement imposed in paragraph 1(c). That provision states that "no one is required to accept or listen to sidewalk counseling, and ... if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling." Although we approved a nearly identical restriction in *New York State Nat'l Org. for Women,* 886 F.2d at 1363–64, we must revisit this issue in light of the Supreme Court's intervening decision in *Madsen.*

The *Madsen* Court struck down a provision in the injunction at issue there that required the defendants, when located within 300 feet of the abortion clinic, to "refrain from physically approaching any person seeking services of the clinic 'unless such person indicates a desire to communicate.'" —— U.S. at ——, 114 S.Ct. at 2529 (quoting injunction). Treating this "no approach" provision as implicating expressive activities protected by the First Amendment, *cf. id.* at ——–——, 114 S.Ct. at 2532–33 (Stevens, *J.,* concurring in part and dissenting in part) (sidewalk counseling is a mixture of conduct and expression), the Court held that "it is difficult, indeed, to justify a prohibition on *all* uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation and to ensure access to the clinic." *Id.* at ——, 114 S.Ct. at 2529.

The cease and desist provision challenged here is somewhat less restrictive than the no approach provision in *Madsen* because it does not completely prohibit sidewalk counselors from initiating contact with persons entering the clinics. This distinction is not dispositive, however, because both the cease and desist provision here and the no approach provision in *Madsen* operate to allow the prospective counselee to control the prospective counselor's opportunity to engage in protected expression.[7] The provisions are thus equally restrictive of the *communication* offered by the counselors; both effectively condition the demonstrator's right to engage in protected expression on another person's wish to hear such expression. Although the prospective counselee need not *listen* to the counselor, she does not have the right to stop the counselor's communication, absent any evidence that the communication is independently proscribable, *see id.,* or that the counselor is engaging in pure conduct that is not protected by the First Amendment. *Cf. id.* at ——, 114 S.Ct. at 2533 (Stevens, *J.,* concurring in part and dissenting in part). Like the no approach provision

---

7. As noted above, Pro–Choice has not disputed that sidewalk counseling is expressive activity

entitled to full First Amendment protection.

in *Madsen,* the cease and desist provision at issue here thus violates the established principle that "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate "breathing space" to the freedoms protected by the First Amendment.' " *Boos,* 485 U.S. at 322, 108 S.Ct. at 1164 (quoting *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988)). Accordingly, we conclude that the cease and desist provision in paragraph 1(c) burdens more speech than necessary to serve the identified government interests.

■ Project Rescue next challenges the prohibition in paragraph 1(e) against "inducing, directing, aiding, or abetting in any manner, others to take any of the [enjoined] actions." Project Rescue contends that this provision violates the First Amendment's protection of free speech because it reaches beyond expression that is likely to produce "imminent lawless action." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927–28, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982). We are not persuaded.

This contention confuses the inquiry as to whether certain speech is entitled to First Amendment protection, the issue raised in *Claiborne Hardware,* with the inquiry as to whether constitutionally protected speech may permissibly be restricted. Indeed, assuming that the challenged restrictions in paragraph 1(e) reach constitutionally protected expression, we must still determine whether the injunction's regulation of that protected expression is justified under the circumstances presented. Because it could not be invalid to prohibit the inducement, direction, aiding or abetting of protected expression that is itself validly prohibited, we conclude that the restriction in paragraph 1(e) as it applies to the valid provisions of the injunction is justified.

■ Finally, Project Rescue challenges the injunction's requirement that it make a "good faith effort to instruct all organizations and individuals [it] believes to be planning to participate in any of the [enjoined] activities ... not to engage or participate in [those] activities." Project Rescue contends that this provision is invalid because it forces Project Rescue to engage in speech repugnant to its views. We disagree. Our decision in *New York State Nat'l Org. for Women,* 886 F.2d at 1352, is dispositive of this contention. There, we held that a leader of an antiabortion group could properly be held in contempt for "fail[ing] to instruct his followers that the TRO prohibited their goal of blocking entry to facilities providing abortion services." *Id.* In accordance with that holding, we reject Project Rescue's challenge to the "good faith effort" provision as that provision applies to the valid provisions of the injunction.

### 2. *Due Process*

Project Rescue further contends that certain provisions of the injunction are impermissibly vague. We disagree.

■ "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Although most void-for-vagueness challenges target municipal ordinances, criminal statutes and other generally applicable laws, *see, e.g., Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (criminal statute); *Village of Hoffman Estates v. The Flipside, Hoffman Estates,* 455 U.S. 489, 491, 102 S.Ct. 1186, 1190, 71 L.Ed.2d 362 (1982) (village ordinance); *United States v. Sun and Sand Imports,* 725 F.2d 184, 186–87 (2d Cir.1984) (federal regulation), Project Rescue's vagueness challenge to the injunction is nonetheless proper because an unclear injunction, like unclear legislation, "may trap the innocent by not providing fair warning" of what is prohibited. *See Grayned,* 408 U.S. at 108, 92 S.Ct. at 2299. Moreover, injunctions pose a particular risk of discriminatory application, *see Madsen,* —— U.S. at ——, 114 S.Ct. at 2524, and that risk constitutes yet another reason to require clear and definite notice of what is prohibited. *See Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99.

■ A regulation is void for vagueness if it is so indefinite that ordinary people cannot understand that which it prohibits.

*See Kolender*, 461 U.S. at 357, 103 S.Ct. at 1858. Moreover, if the regulation does not include minimal guidelines to govern its enforcement, it is impermissibly vague. *Id.* at 358, 103 S.Ct. at 1858. Finally, if an injunction implicates fundamental rights, the reviewing court must insist on strict compliance with the requirement of clarity. *Cf. Village of Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. at 1193 ("[t]he degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment," and economic regulations are subject to more lenient vagueness test).

 First, Project Rescue contends that the prohibitions on "touching" and "crowding" in paragraph 1(c) are unconstitutionally vague. The word "touching" is, however, sufficiently clear to allow ordinary persons to understand what is prohibited. Moreover, although the meaning of the word "crowding" is somewhat less clear than the meaning of "touching," we believe that, in the context of paragraph 1(c)'s other prohibitions, the "crowding" restriction is not impermissibly vague.

 Project Rescue also cites the prohibition on "excessively loud sound[s]" in paragraph 1(d) as vague. This provision, however, is accompanied by a definitional clause that makes clear that an "excessively loud sound" is one that "injures, disturbs, or endangers the health or safety of any patient or employee of a health care facility at which abortions are performed." The noise restriction, therefore, is valid.

 Project Rescue further asserts that the injunction is vague because it is impossible for Project Rescue to identify the clinic staff and patients who are protected under the terms of the injunction. Project Rescue need not, however, identify those persons who are clinic staff members or patients in order to bring its activities into compliance with the injunction. Paragraphs 1(b) and

1(c) refer only to "*any* person ... seeking access to or leaving such facilities." (emphasis added). Moreover, paragraph 1(d) prohibits noises that injure, disturb or endanger the health or safety of "any patient or employee of a health care facility at which abortions are performed." This provision does not require Project Rescue to identify individual patients or employees and then to make a particularized assessment regarding the noise level that is permissible as to that person. Rather, Project Rescue must keep its noise levels low enough that they do not injure, disturb or endanger the health of all patients and staff members inside or outside the facilities. Accordingly, these provisions are also sufficiently definite to defeat Project Rescue's vagueness challenge.[8]

### C. *Other Challenges*

 Project Rescue also contends that the injunction's prohibition against trespassing on the facilities' parking lots, parking lot entrances, driveways and driveway entrances is redundant and unnecessary because state trespass laws reach such conduct. This contention is essentially an objection to the district court's determination that women seeking abortions will be denied access to the plaintiff facilities if an injunction prohibiting such trespasses does not issue. Project Rescue has, however, given us no reason to believe that the district court's determination was erroneous. Indeed, the determination is supported by facts in the record, facts that are themselves not challenged by Project Rescue. For example, the district court found that the defendants often congregate at or near the driveway entrances and that they thereby succeed in impeding access to the clinics. *Pro–Choice I*, 799 F.Supp. at 1424. Moreover, the court found a threat of continuing trespasses. *Id.* at 1432. Project Rescue's contention therefore fails.

 Finally, Project Rescue contends that private property owners, such as the

8. Project Rescue also presents an "overbreadth" challenge to paragraphs 1(b), 1(c) and 1(d) of the injunction. Project Rescue asserts that these provisions are "overbroad" because they are not narrowly tailored. We view this argument as referring to the traditional test for time, place and manner restrictions on expression, the test that was recently replaced by a more stringent test for content neutral injunctions restricting expression. *See Madsen*, —— U.S. at ——, 114 S.Ct. at 2525. Because we have applied the new *Madsen* test here, we do not specifically address Project Rescue's overbreadth challenge.

plaintiff facilities, cannot properly assume regulatory control over government property. While this proposition is undoubtedly true, it is inapposite here, where the district court, not the plaintiff facilities, issued the injunction restricting Project Rescue's activities on public property.

### IV. *Summary*

To summarize, we uphold all challenged portions of the preliminary injunction except (1) the provision in paragraph 1(b) prohibiting "demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities, or within fifteen feet of any person or vehicle seeking access to or leaving such facilities," and (2) the provision in paragraph 1(c) providing that "no one is required to accept or listen to sidewalk counseling, and that if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling." We strike down those two provisions as unconstitutional because they burden more speech than necessary to serve the identified significant government interests.

### CONCLUSION

In *Pro–Choice I,* we affirm in part and reverse in part the order issuing the injunction. In *Pro–Choice II,* which does not involve the First Amendment issues, we affirm the order denying the motion to vacate the injunction.

OAKES, Senior Circuit Judge, (dissenting):

While I agree with the greater part of the majority's ruling, I disagree as to two points: I believe that both the fifteen-foot "bubble zone" and the cease and desist order are necessary under the circumstances of this case to ensure the health and safety of the patients receiving abortions at the clinics. Both provisions further the significant government interest in the safe performance of abortions, and in light of the past behavior of the Project Rescue protesters, the provisions burden no more speech than necessary, and, consequently, do not violate the First Amendment. I will address each provision separately.

### I. *The Bubble Zone.*

*Madsen v. Women's Health Ctr., Inc.,* —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) requires that the injunction "burden no more speech than necessary to serve a significant government interest." *Id.* at ——, 114 S.Ct. at 2519. I agree with the majority that all three of the government interests identified by the district court are indeed significant: 1) the safe performance of abortions, 2) public safety, and 3) protection of one group's constitutional rights without sacrificing another group's constitutional rights. *See ante* pp. 141–42. The question, therefore, is whether the so-called bubble zone burdens more speech than necessary to serve those interests. The majority concludes that it does, based, first, on the fact that other provisions of the injunction restrain Project Rescue from obstructing or impeding access to the clinics, parking lots and driveways, *ante* p. 142, and, second, on its conclusion that the record does not reflect a need to impose restrictions beyond those other provisions. *Ante* p. 143.

In my view, although the other provisions in the injunction do much to promote free access to abortions, they fall short of what is required to ensure that abortions are safely performed at facilities in the Western District of New York. At least we must accord the district court's findings and conclusions to that effect much weight. There is ample evidence in the record of the health risks faced by women who are targets of the "sidewalk counseling" and other Project Rescue demonstrations. After an extensive evidentiary hearing the district court found that in addition to physically blocking access to the clinic, "[t]he demonstrators also crowd around people trying to enter the facilities in an intimidating and obstructing manner ... This activity causes stress and sometimes even physical injury to the patients, patient escorts and medical staff, and disrupts the

atmosphere necessary for rendering safe and efficacious health care." *Pro–Choice Network of Western New York v. Project Rescue Western New York,* 799 F.Supp. 1417, 1424 (W.D.N.Y.1992); *see also ante* p. 136. The district court also found that women who suffer from stress and anxiety caused by confrontations with the protesters run an increased risk of complications associated with abortions. *Pro–Choice Network,* 799 F.Supp. at 1427; *see also ante* p. 136.

These health risks are caused by actions of the protesters that go far beyond the physical barricading of the clinic entrances, parking lots and driveways. The bubble zone would prevent the protesters from harassing patients at a physically close range and from swarming around patients in large groups as they approach the clinic. Face-to-face confrontation such as this presents a risk of duress that is "an appropriate target of regulation." *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. ——, ——, 112 S.Ct. 2701, 2708, 120 L.Ed.2d 541 (1992).

The district court determined that the fifteen-foot bubble zone was necessary to ensure that abortions performed at the clinic are without undue health risks to the patients. "[S]ome deference must be given to the [district] court's familiarity with the facts and the background of the dispute between the parties even under our heightened review." *Madsen,* —— U.S. at ——, 114 S.Ct. at 2549.

The majority suggests that even if the district court believed that the bubble zone was warranted to further significant government interests, it should first have imposed a narrower injunction without a bubble zone to determine whether a less restrictive solution would be sufficient. *Ante* p. 143. This iterative process seems to me unwise and not required by *Madsen.* The *Madsen* Court examined the facts present in that case in order to determine whether the buffer zone was necessary. *Madsen,* —— U.S. at ——, 114 S.Ct. at 2526–27. One factor in the Court's analysis was that a less restrictive injunction had proved ineffective. *Id.* The Court did not state or even imply that this factor need be present in order for a buffer

zone or its equivalent to be a necessary remedy. Requiring the district court to impose a less restrictive injunction than the one the court found necessary is inefficient and perhaps dangerous. While the district court waits for the injunction to prove ineffective, patients may well continue to suffer the extreme stress and anxiety that causes the increased health risks associated with abortions.

In the case before us, the past actions of the protesters justify the imposition of the bubble zone. At least six of the defendants violated the temporary restraining order imposed by the district court. *Ante* p. 143. Further, many of the sidewalk counselors and other defendants were arrested for harassment on more than one occasion, yet they continued to harass and intimidate patients, patient escorts and clinic staff. *Pro–Choice Network,* 799 F.Supp. at 1425.

The bubble zone would burden the least speech necessary to further the goal of ensuring the safe performance of abortions. The bubble zone is much less restrictive than the buffer zone upheld in *Madsen.* The bubble zone prohibits the protesters from demonstrating within fifteen feet of clinic entrances and driveways, or within fifteen feet of persons entering a clinic, as compared with the buffer zone in *Madsen* which extended thirty-six feet from clinic property. In addition, unlike the buffer zone in *Madsen,* the bubble zone does not prevent the protesters from expressing their views inside the fifteen-foot radius. Importantly, two representatives of the demonstrators are allowed to enter the zone to "counsel" patients. The small size of the zone ensures that the patients, patient escorts and clinic staff inside the zone will hear anything said by the demonstrators at the edge of the zone and see any signs or pictures displayed by the demonstrators. *Cf. Madsen,* —— U.S. at ——, 114 S.Ct. at 2549 ("Protesters standing across the narrow street from the clinic can still be seen and heard from the clinic parking lots"). Hence, the district court carefully designed the zone to allow Project Rescue effectively to communicate its views to the patients and staff of the clinic while ensuring

that the patients are not so overwhelmed as to jeopardize their well-being. I would, therefore, uphold that portion of the injunction.

## II. *The Cease and Desist Order.*

The Court in *Madsen* struck down a provision that prohibited demonstrators from approaching patients within 300 feet of the clinic unless the patients affirmatively requested to communicate with the demonstrators. *Id.* at ————, 114 S.Ct. at 2528–30. The cease and desist provision in this case is much less restrictive than that "no approach" provision. The cease and desist order provides that if a patient does not want to be counseled, the protesters must cease their attempts at counseling that person. This provision allows people who are the targets of focused counseling efforts by the protesters to walk away from the counseling. The purpose of the provision, like that of the bubble zone, is to reduce the potentially harmful stress and anxiety experienced by the patients who are forced to pass through the demonstrators in order to avail themselves of clinic services.

In striking down this provision, the majority relies on a proposition articulated by the Court in *Boos v. Barry*, 485 U.S. 312, 322, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988) (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988)), that "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Ante* p. 144 (internal quotation marks omitted). In *Boos*, the statute at issue prohibited any person from displaying a sign outside an embassy that tended to bring the foreign government into "public odium." *Boos*, 485 U.S. at 316, 108 S.Ct. at 1161. In striking down the statute, the Court held that foreign diplomats would have to suffer those indignities. *Id.* at 329, 108 S.Ct. at 1168. The *Hustler* case involved a libel claim by a minister over a parody in a magazine. *Hustler*, 485 U.S. at 48, 108 S.Ct. at 878. The Court held, similarly, that even "outrageous" caricatures must be tolerated in the interest of freedom of expression. *Id.* at 55, 108 S.Ct. at 881–82.

This case involves countervailing concerns not present in *Boos* or *Hustler*. Focused picketing is fundamentally different from generally disseminated communication that cannot be banned from public places. *Madsen*, —— U.S. at ——, 114 S.Ct. at 2527 (citing *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)). This case is analogous to *Frisby*, in which the Court upheld an ordinance that prohibited picketing in front of or around an individual residence. *Id.* at 488, 108 S.Ct. at 2504. The Court reasoned that people are captive audiences inside their homes, and in the interest of residential privacy, the Court allowed the ban on picketing. *Id.; cf. Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974) (upholding regulation of advertisement on mass transit because riders were captive audience); *Cameron v. Johnson*, 390 U.S. 611, 622, 88 S.Ct. 1335, 1341, 20 L.Ed.2d 182 (1968) (upholding statute prohibiting picketers from blocking entrance to and egress from courthouse). Women who want abortions have no choice but to brave the demonstrations en route to the clinics. They are, in effect, a captive audience to the messages of the protesters.

The cease and desist provision burdens no more speech than necessary. The provision does not prevent the protesters from expressing their views. They can approach and attempt to counsel patients, escorts and staff. The provision only prevents the protesters from persistently badgering people at a close range. The protesters would still be able to communicate their views to the patients, escorts and staff, who would still be forced to hear and see the protest, no matter how insulting or offensive.

## III. *Conclusion.*

Because I believe both the bubble zone and the cease and desist order are necessary for the injunction to fully effectuate its goals, I

would uphold those portions of the injunction.